ORIGINAL

FILED
MAY - 8 2007
U.S. COURT OF FEDERAL CLAIMS

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **IMS ENGINEERS-ARCHITECTS, P.C.** | ) |
| **Plaintiff** | ) |
| **v.** | ) Case No. 07-291 C |
| **THE UNITED STATES OF AMERICA, ARMY CORPS OF ENGINEERS** | ) |
| **Defendant** | ) |

## COMPLAINT

Plaintiff, IMS Engineers-Architects, P.C. ("IMS" or "Plaintiff") files this complaint for breach of contract, against the United States of America, acting through the Army Corps of Engineers ("Corps"), Baltimore District and Huntsville Division. ("Defendant") This is a breach of contract action. The Government diverted work under an 8(a) set-aside contract to a large business and also refused to pay the Plaintiff for the work already done under the contract. When Plaintiff objected, and the illegal conduct was exposed, the Defendant punished the Plaintiff by withholding work on the two (2) other contracts under its jurisdiction.

## I. PARTIES AND JURISDICTION

1. Plaintiff, IMS, is a duly incorporated business under the laws of New York, with its principle place of business, when the relevant events took place, located at 115 Metro Park, Rochester, New York, 14623 and currently located at 3098 Clover Street, Pittsford, New York 14534.

2. This complaint concerns the actions and inactions of the Defendant, the U.S. Army Corps of Engineers, 10 South Howard Street, Baltimore Maryland 21201, acting through its Contracting Officers and their authorized representatives on Contract Numbers DACA 87-92-C-0004 ("Contract 0004"), DACA 31-92-D-0046 ("Contract 0046"), and DACA 31-95-D-0057 ("Contract 0057").

3. On or around June 29, 2000, IMS submitted a request for equitable adjustment ("REA") to Contracting Officer James Rich with the Baltimore District of the Corps. On July 23, 2001, the Corp's Baltimore District received a certification by Iqbal Singh, converting the REA into a certified claim for equitable adjustment pursuant to the Contract Disputes Act of 1978.

4. On August 1, 2001, the Armed Services Board of Contract Appeals docketed appeals on the three contracts.

5. On August 8, 2001, the Corps served a motion to dismiss the appeals, on the grounds that sixty (60) days had not elapsed since the receipt of the certified claim by the contracting officer.

6. By Order dated August 15, 2001, the ASBCA dismissed the appeals without prejudice.

7. IMS and the Corps then engaged in an unsuccessful course of negotiation. To date, the contracting officer has not issued a formal final decision on the claim.

8. This Court has subject matter jurisdiction over this matter pursuant to the Contract Disputes Act, 41 U.S.C. § 601 et seq., and the Tucker Act, 28 U.S.C. § 1491(a) (1).

## II. NOTICE OF RELATED CASES/ CLAIMS

9. Plaintiff is unaware of any related cases currently pending.

## III. FACTUAL BACKGROUND

10. IMS was awarded three contracts by the Corps. One was Fixed Price Contract 0004, and Contracts 0046 and 0057 were Indefinite Delivery/ Indefinite Quantity ("IDIQ") contracts. Despite the 0004 Contract being set aside pursuant to 8(a) program, the Corps refused to pay for the work done by IMS and engaged in a scheme to divert the work to a large business. When IMS objected, the Corps essentially blacklisted IMS, preventing IMS from obtaining any substantial work under the 0046 and 0057 Contracts.

11. There is a lot of correspondence on this subject matter. However, the facts proving this course of conduct are actually contained in a Government audit report prepared by John E. Templeton, Chief of the Army Audit Office. This report was prepared in July of 1997, after Iqbal Singh had made General Joe Ballard of the U.S. Army Corps of Engineers aware of the improprieties he had uncovered. Though this report was prepared by the Government itself, it corroborates many of IMS's contentions beyond a shadow of a doubt.

12. IMS was a full-service consulting engineering firm specializing in hazardous, toxic and radioactive waste work. Their staff was knowledgeable in environmental, health physics, nuclear engineering, geological, and hydro-geological technical fields, with a strong emphasis on health and safety, risk management, environmental compliance, remedial investigation, design and supervision of construction. IMS also supplied services and supervision for civil, structural, electrical, mechanical, highway and bridge work.

13. Mr. Iqbal Singh, the principle of the firm, has a Masters degree in environmental engineering, and is a Professional Engineer in the State of New York, New Jersey, and

Pennsylvania. He has over 25 years of experience in hazardous, toxic and radioactive waste, as well as general and environmental engineering, including asbestos, radon, municipal and infectious waste.

14. IMS has worked for several federal and state agencies in the past, including the United States Environmental Protection Agency, U.S. Air Force, U.S. Navy, U.S. Army Corps of Engineers, U.S. Postal Service, Veterans Administration hospitals, New York State Department of Environmental Conservation, State University Construction Fund, and several other federal and state agencies. IMS has also provided consulting services to the private sector. IMS has provided consulting services all over United States, including Hawaii. IMS was an established and well recognized environmental firm. Moreover, IMS was ranked number five (5) in the List of twenty five (25) consulting engineers for conducting hazardous toxic waste work and general environmental work for the State of New York. The List is established on a national basis. Therefore, it is clear that IMS was a qualified company capable of performing all the services required in the above referenced contract. IMS was singled out by the Corps to be a victim of bad faith and discriminatory practices. In doing so, the Government breached its obligations of good faith and fair dealing with respect to the subject contracts.

**COUNT 1**

**IV. IMS WAS WRONGFULLY DEPRIVED OF WORK UNDER CONTRACT NO. DACA87-92-D-0004, BREACHING THE GOVERNMENT'S DUTY OF GOOD FAITH AND FAIR DEALING**

15. On December 24, 1991, IMS was awarded 8(a) set aside subcontract No. DACA87-92-C-0004, by the Small Business Administration, New York Branch (hereinafter "SBA") as part of a tripartite agreement under Contract 0004 between the

SBA, IMS, and the Department of the Army, Corps of Engineers, Huntsville Division. The subcontract was awarded to IMS after over five years of submitting proposals to the Huntsville Division, without success. The proposal submitted by IMS under the applicable request for proposals was for a five million dollar ($5,000,000.00) IDIQ contract for architect-engineering services for performance of remedial investigations and remedial design in New York State. However, the actual subcontract awarded to IMS was a Fixed Price contract in the amount of eight hundred thousand six hundred and sixty three dollars ($859,663.00) for conducting Resource Conservation and Recovery Act ("RCRA") facility investigations at the Watervliet Arsenal in New York State. Subsequent modifications to Contract 0004 amended the scope of work, time for delivery, and set the final contract amount at one million four hundred and six thousand three hundred and twenty dollars ($1,406,320.00).

16. The work required on Contract 0004 was essentially divided into two categories. Category One was comprised of the development and submittal of an RFI Phase 2 Work Plan which was to be coordinated with an existing Phase 1 Work Plan, previously developed by another contractor. This Phase 2 Work Plan was to consist of three documents; the RFI project scoping document, the RFI Field Sampling Plan document and the Community Relations Document. The purpose of these documents was to:

1. Provide a consolidated report of site history, current site activities, and potential environmental impacts;

2. Familiarize all personnel who are working on the project with site conditions;

3. Provide project plans and task by which the A/E personnel shall conduct RFI activities.

17. Category Two entailed the implementation of the previously developed work plan.

18. At the direction of the Corps, and because of time constraints, IMS began work swiftly on the Contract, completing 70% to 80% of the work. With the full knowledge of the Corps, IMS progressed the work beyond Category One of the Contract, in order to ensure that the project would be finished in time. The Corps continually stressed the need to complete the project within a short period of time, which would have been impossible to achieve, had IMS not moved ahead rapidly with the work.

19. While the Contract was originally issued by the Huntsville Division of the Corps, after IMS had begun performance, IMS was informed that all of Huntsville's Hazardous, Toxic, and Radioactive Waste contracts would be transferred to other districts.

20. On February 24, 1994, before the transfer from Huntsville to Baltimore, according to the Government audit report, page 9, representatives from Watervliet Arsenal, as well as the Huntsville Division and Baltimore District held a secret and informal meeting, and "an undocumented decision was made to terminate for convenience this IMS contract." After termination, the work was to be given to Malcolm and Pirnie ("M&P"), a large contractor who is a favorite with the Baltimore District and the Watervliet Arsenal, with offices essentially in the backyard of the Watervliet Arsenal work site, and extensive connections within the Baltimore District. IMS's offices are located approximately 220 miles from the Watervliet Arsenal, in Rochester, New York.

21. According to the audit report, page 9, on August 8, 1994, the Watervliet Arsenal formally requested that the Corps terminate IMS.

22. Also during the month of August, while IMS's contract was still in effect, it is believed that the Corps Baltimore District proceeded to request work proposals from M&P that duplicated the work being done by IMS. Upon information and belief, M&P had an IDIQ contract of approximately seventy five million dollars ($75,000,000.00) with the Corps, allowing this work to be given to M&P without open competition.

23. While the IMS contract was not huge by M&P's standards, upon information and belief, M&P was interesting in getting the contract, since the remedial investigation study on the Watervliet Arsenal would naturally lead into a twenty to forty million dollar ($20,000,000.00 to $40,000,000.00) remediation contract, and M&P wanted to position themselves for this work.

24. Around this time, IMS was informed that Contract 0004 was to be terminated. This was a great surprise to IMS, since they had already completed 70% to 80% of the Contract work, the work plan under Contract 0004 was specifically geared to IMS, and it would require a great duplication of effort if awarded to another contractor.

25. The SBA strongly objected to the Government's actions and advised that IMS's contract should be transferred, not terminated. In a letter to the Huntsville Division, dated August 11, 1994 the SBA stated "Our participant firm, IMS, has been performing in a satisfactory manner on assignments issued under this contract at the Watervliet Arsenal. . . We request that the SBA's total contract of $1,536,616 with you be transferred to the Baltimore District. . . IMS has been capably performing under an existing contract with Baltimore Corps District and has received a very favorable evaluation for a project completed by them recently. Their contracting and technical people are familiar with the firm's expertise."

26. In what appeared to be an attempt to buy IMS's silence, on August 19, 1994, M&P offered to give IMS, as a subcontractor, approximately twenty five percent (25%) of the total work. All of the total work was previously being performed, as a prime contractor, by IMS. IMS rejected this offer on September 2, 1994.

27. As 1994 went on, the SBA became aware of the scope of the improprieties involving the Watervliet Arsenal, and wrote a more strongly worded letter to the Corps, dated August 31, 1994: "Because of the variety of positions, suggestions and undocumented concerns, the U.S. Small Business Administration felt it was necessary to restate its position on this matter. . . It is well documented on this concern and numerous others that IMS, P.C. performs in a professional and satisfactory manner, with no documented delays. . . This office is not aware of any information that would justify that termination of this contract. The major concern here is the proposal to terminate IMS and assign the remainder of the work on this project to a large business. The two alarming issues are this: That the U.S. Army Corps of Engineers or any agency would take such measures to the detriment of a small disadvantaged business, without sound justification; and at the expense of a small disadvantaged business award the work to a large business. <u>This proposal appears to contradict many federal acquisition guidelines</u>." (emphasis added).

28. In or around August of 1994, again while IMS's contract was still in effect, it is believed that <u>M&P was awarded a contract for two million fifty seven thousand four hundred and sixty nine dollars ($2,057,469.00), to perform the same work that IMS was already contracted to perform for one million four hundred six thousand three hundred and twenty dollars ($1,406,320.00).</u>

29. The Government Audit Report substantiated the irregular conduct of the Government in Contract 0004: "During August 1995 [ IMS believes that this actually took place in 1994], at Watervliet's request, CENAB awarded Malcom Pirnie (M&P) (contract DACA31-94-D-0017) over $2M of delivery orders for the work IMS was supposed to perform under the CEHNC contract (DACA87-92-C-0004). . . The IMS termination occurred about six months after the informal group termination decision was made. Correspondence, file notes memos, ect. indicate that during the six months pre-termination period considerable <u>informal</u> USACE staff and customer discourse occurred." (emphasis added).

30. In or around July/August of 1994, the Government traveled to IMS and represented that it only owed IMS for a small portion of Contract 0004 and offered approximately ten thousand dollars ($10,000.00) as a final payment. The Government was well aware that IMS performed a substantial amount of work at the Government's behest beyond Category One. It is believed that this is why the Government did not want to issue a termination for convenience at that time, because it would formally obligate the Government to pay IMS all of its costs. The Government was attempting to beat IMS out of its costs, presumably to use the money to pay M& P for the same work. If the Government formally issued a termination for convenience it would have to "let the cat out of the bag". How could the Government justify a termination of an 8(a) contract while at the same time a large favored business was repeating, at a greatly inflated cost, the same work that IMS had undertaken to perform at a much lower cost?

31. IMS was concerned that if it continued to insist on its rightfully owed money, when the contract was transferred to the Baltimore District without being terminated,

IMS would run the risk of being denied work under the existing Baltimore District Contract 0046 as further punishment.

32. Despite this behind the scenes maneuvering, the IMS Contract remained in effect, and on September 13, 1994, IMS Contract 0004 was formally transferred to the Baltimore District.

33. During this transfer, in an obvious and blatant attempt to rationalize its improper failure to pay IMS, the Huntsville Division gave IMS negative ratings. This was obviously in bad faith because during its performance IMS had never received any negative or nonconforming reports from the Corps of Engineers. To the contrary, IMS had continuously received commendations from the pertinent personnel for their outstanding performance.

34. IMS knew that its work had been of excellent quality. While the Huntsville Division and the Director of the Watervliet Arsenal apparently had concocted "informal" complaints regarding IMS's work, the Audit Report noted that no "cure notice" or "show cause notice" was ever issued to IMS, thus giving them no formal statement as to the alleged deficiencies, or opportunity to respond.

35. Page 2 of the audit report confirmed that the animus against IMS was not based upon any formal or documented deficiencies: "IMS was not the first choice contractor of USACE staff or our customers and at times their timeliness was questioned. However, formal USACE performance appraisals rated IMS work acceptable or better." (emphasis added). This confirms that the "informal" behind the scenes meetings that lead to IMS's termination used different standards compared to the formal standards that apply to such a review process.

36. Since the work under IMS's Contract 0004 had been given to M&P, the Corps declared IMS's Contract 0004 to be nonexistent and advised the SBA of this action, though they did not issue a proper termination for convenience. On November 22, 1994, Iqbal Singh of IMS met with Lt. Col. Ralph Graves of the Baltimore Division. Lt. Col. Graves stated that the work under IMS's Contract 0004 was to be performed by M&P, and that "the decision had already been taken in the case."

37. Lt. Col. Graves of the Baltimore District then asked IMS if they would prefer being terminated for convenience or be given work in exchange for the losses suffered by IMS and the work taken away from them under Contract 0004. IMS could see the writing on the wall and stated that they would like more work, and left the meeting assuming that such work would be issued, as agreed by the parties. To cover the losses alone, IMS needed to be awarded eight to ten million dollars ($8,000,000.00 to $10,000,000.00) worth of work by the District. Again, Contract 0004 was for five million dollars ($5,000,000.00). IMS had won this contract in nationwide competition. Once again, the District took away the potential award of twenty to forty million dollars ($20,000,000.00 to $40,000,000.00) worth of work from IMS when they usurped the opportunity for IMS to complete the remedial investigation for this site.

38. IMS waited for over twenty (20) months, but little if any work was given to them, and their losses continued to mount. IMS then requested a meeting with Col. Randall Inouye, during which the Colonel apparently decided to finally issue a formal termination for convenience.

39. IMS finally received a formal termination letter on March 25, 1996 and the Government continued to deny IMS all of the compensation that it was entitled to.

40. There was no reasonable explanation for this irregular and "informal" decision to replace IMS with a large contractor. The audit report stated: "We question whether the CENAB 25 March 1996 termination for convenience of contract DACA 87-92-C-0004 with IMS was in the interest of the Government. At the time of termination the contract amount was $1,406,320 with a completion date of 22 July 1996. . . The terminated contract work was performed by Malcolm Pirnie under CENAB Contract DACA31-94-D-0017 at a cost of $2,057,469. No cost analysis or similar study was prepared to support that an overall payment of $2,913,418.50 for work originally priced at $1,406,320 was in the Government's interest." (emphasis added). There was no apparent reason, other than corruption and favoritism, for the Corps to throw away a sum of over six hundred thousand dollars ($600,000.00) by giving the work to M&P. One hundred percent (100%) of the work done by IMS Engineers was handed over to M&P. Therefore, as a matter of fact, the work awarded to M&P was done by them at more than double the price ($2,913,418.00 divided by $1,406,320.00 = 207%) compared to what would have been paid to IMS Engineers to do the same work.

41. IMS finally signed a termination modification on November 14, 1996, under intense pressure. More than two years had elapsed since IMS's work was illegally taken away and given to M&P, bringing IMS to the brink of financial collapse. As part of this termination, the Government only paid a portion of IMS's expenses. This termination was procured by fraud and duress, and must be considered void.

42. At the time this modification was signed, IMS did not know the full extent of the wrongdoing surrounding the hand over of its work to M&P. Had IMS known what really occurred in regard to this contract, they never would have agreed to the termination.

43. Much latter, in June 2003, IMS finally received the audit report in connection with the ASBCA hearing on another matter, and first realized the full scope of the Government's fraud. The Government's previously inexplicable conduct was officially revealed to be the product of back room meetings and under-the-table pressure and IMS realized that they had been deceived and manipulated by the Corps.

44. The pressure and duress against IMS was greatly increased by the fact that the Corps had practically ceased giving IMS any delivery orders under Contracts 0046 and 0057 while attempting to get IMS to agree to the termination of Contract 0004. IMS believed that it had an oral agreement that it would be given more contract work, and would be able to survive as a business, if it complied with the Corps' wishes in regards to Contract 0004.

45. As detailed in Counts Two (2) and Three (3), such work was not forthcoming. IMS had relied upon the provision of such work when it signed the termination.

46. The problems encountered by IMS were apparently part of a pattern. On page 14, the audit report noted the failures of the Corps' small business contracting programs: "The Small Business Program synergism and compliance issues are derived by multiple factors such as: a lack of command and large contractor interest, and many districts having only a part-time advocate. As a result, small businesses, small and disadvantaged businesses, and women owned businesses subcontracting opportunities are not being maximized."

47. This audit report even found that the contracting procedures used by the Corps resulted in the lion's share of the available work being directed to large businesses with high dollar IDIQ contracts with the Corps, as had happened to IMS. (M&P, for example,

is believed to have been operating under an IDIQ contract worth approximately seventy five million dollars ($75,000,000.00)).

48. The audit report, at page 18 and 19 reads "Competitive IDIQ awards are generally made to large businesses. The proliferation of large IDIQ contracts has reduced USACE small business contract award opportunities. Many of the delivery orders now awarded to IDIQ large contractors would have in the past been set aside for small business and competed competitively or put out of proposal. . . Six contractors (four large businesses) were awarded 70 delivery orders in the amount of $10.125M. Three of these contractors (two large businesses) accounted for 63 (90%) of the delivery orders and $8.828M (87%) of the dollars. This example documents that IDIQ contracts can adversely impact the overall number USACE competitive awards. . . <u>However, while the initial IDIQ contract award may be done competitively, the included rates may not create a "best pricing" situation when a subsequent delivery order is awarded non-competitively at a latter date</u>. Also USACE compliance with the 'Competition in Contracting' and 'Small Business Investment Act' are adversely affected." (emphasis added).

49. IMS was damaged by the exact scenario described above, except that the scenario was implemented in its worst form, with so many other wrongs attached to it. IMS's work was removed in bad faith, and given to a large business at a highly non-competitive rate. Upon information and belief, the Corps was using these large IDIQ contracts to unethically direct work to favored and influential contractors at an inflated price, to the detriment of the U.S. taxpayer.

50. Due to this behavior, the Government breached Contract 0004, and IMS is entitled to damages in the sum of at least three million three hundred twenty nine

thousand one hundred and thirty five dollars ($3,329,135.00). This figure does not include: 1) damages because of Baltimore District's ruthlessly decimating IMS's business and 2) damages because Baltimore District usurped the strong potential opportunity for IMS to obtaining remedial design and actual implementation work at the Watervliet Arsenal, after having completed the remedial investigation work for this site.

**COUNT 2**

**V. IMS WAS WRONGFULLY DEPRIVED OF WORK UNDER CONTRACT NO DACA31-92-0046, BREACHING THE GOVERNMENT'S DUTY OF GOOD FAITH AND FAIR DEALING**

51. On September 30, 1992, IMS was awarded 8(a) set aside contract No. DACA31-92-0046 by the SBA. The Contract was an 8(a) set aside, and therefore the SBA was the prime contractor, and IMS was a subcontractor to the SBA, but for all practical purposes, IMS was the prime contractor.

52. Contract 0046 was an Indefinite Delivery, Architect-Engineer, Cost Reimbursement Type Contract for the purpose of performing various engineering/architecture services in support of the expanded environmental missions of the U.S. Army Toxic and Hazardous Materials Agency, for a period of one year and with options for four additional years. The guaranteed minimum was one hundred thousand dollars ($100,000.00) with the allowable maximum contract amount of three million dollars ($3,000,000.00) over the base and four option years.

53. The award of this Contract 0046 was made after the submission, without success, of over 20 proposals by IMS, and the most diligent efforts to obtain work from the U.S Army Corps of Engineers and the Army Environmental Center.

54. Until the above mentioned issues began with Contract 0004, the Corps ordered work regularly under Contract 0046. IMS was not issued a single task order on Contract 0046 since September 19, 1994, which is approximately when IMS began contesting the bizarre hand out of its work to M&P. Upon information and belief, this was not a coincidence, rather it was a deliberate reprisal, and an attempt to gain leverage over IMS in the negotiations surrounding Contract 0004.

55. When IMS refused to agree to accept the trivial payment of approximately ten thousand dollars ($10,000.00) under Contract 0004, work orders inexplicably stopped. Because of bad faith on the part of the agency, the Task Orders awarded under Contract 0046 were well below the stated maximum contract amount. The total amount of work given to IMS under Contract 0046 was only six hundred forty six thousand four hundred fourteen dollars. ($646,414.00). Although this amount was more than the minimum amount, it is well below what IMS would have been awarded, had the agency not acted in bad faith and attempted to punish IMS because of their actions on Contract 0004, where IMS refused to be railroaded by the Corps. Moreover, the amount awarded is relatively minimal compared to other 8(a) firms who were awarded contracts after IMS.

56. A listing of Army Environmental Center 8(a) contracts shows that lack of work was not the reason for the lack of delivery orders to IMS. The ordering period for Contract 0046 expired on September 30, 1997, with two million three hundred forty five thousand three hundred thirty five dollars ($2,345,335.00) in capacity remaining for the "excellent" rated contractor IMS. However, under Contract DAAM01-94-D-0020 with a contractor by the name of Plexus, also ending in 1997, the Government had ordered four million thirty nine thousand three hundred and two dollars ($4,039,302.00) on a contract

with a maximum of two million nine hundred and ninety thousand five hundred and ten dollars ($2,990,510.00), actually exceeding the allowable contract amount for this favored contractor. Also, Contract DACA31-93-D-0064, with a contractor by the name of Horne Eng., terminating in 1997, had been used for an amount of six million three hundred thousand dollars ($6,300,000.00). This amount of work was awarded against a contract of only three million dollars ($3,000,000.00.). That is, this contract was filled to more than two hundred percent (200%) of its capacity.

57. In 1997, Iqbal Singh visited Mary Ann Mitchell, an assistant contracting officer in the Baltimore District of the Corps. She informed Mr. Singh that all the other 8(a) IDIQ contracts issued at the same time as IMS's had been used to the maximum allowable dollar amounts. Also, at the time of this conversation, the Corps was preparing to issue more contracts under the 8(a) program. Nonetheless, orders had explicably halted under IMS's Contract 0046.

58. On November 16, 1994, not knowing that it had been "blacklisted," IMS wrote to the U.S. Army Environmental Center regarding Contract 0046, enclosing IMS's qualifications, evaluations, and experience profile. In another letter, dated November 18, 1994, IMS pointed out "You were kind enough to award the subject contract to our firm sometime ago. . . We realize we have not been as fortunate as others to get some assignments from your office."

59. At the same time when a lot of work assignments were being handed out to others, IMS could not get a single task order, despite contacting numerous Corps personnel, such as Colonel Randall R. Inouye, Lt. Col Ralph Graves, Mr. James Hersey, Mr. Joseph Riffken, Mr. William Ryals, Ms. Christine Correale, and at their suggestion,

to several other technical and non-technical professionals. In addition, at the suggestion of Mr. Ryals, IMS approached other large consultants who could possibly help IMS obtain some work through some of their clients who get their work done through the Baltimore District but had no current contracts with the Baltimore District. When IMS contacted these large consultants, in an attempt to gain work, the consultants contacted the Corps for a reference, and upon information and belief, the Corps indicated that IMS was an inferior contractor and/or not liked by the District, despite the fact that IMS's official ratings were excellent.

60. There was no reason for these bad references, as evidenced by the positive performance reports received by IMS. The only plausible explanation for the Corps' actions must relate to the improper termination of Contract 0004, in which IMS refused to settle for a sum significantly lower than their costs. Therefore the Corps was discriminating against IMS from participating in the Corps consulting services program. Because of the discriminatory and bad faith actions of the Corps, IMS could not access work through other consulting engineers and or their clients.

61. On June 26, 1995, IMS wrote to Colonel Daniel F. Uyseugi of the U.S. Army Environmental Center, noting that IMS had been awarded an IDIQ contract over three years before and "We understand that some of the firms who came much after in the program have been much more fortunate in obtaining work than us."

62. On April 1, 1996, IMS wrote to Colonel Uyesugi, informing him that "During the last four years, we have tried our best to participate in the program but have virtually not succeeded. We do however, observe that some of the more fortunate firms have been able to participate to their full capacity and much more."

63. Along with the April 1, 1996 letter, IMS enclosed the performance evaluation performed on one of the few task orders issued under Contract 0046, completed on April 10, 1994, before the issues arose with Contract 0004, and before the informal freeze on awarding work to IMS. This report stated that IMS's over all rating was "excellent," IMS was recommended for future contracts, and it noted no deficiencies. It stated "Overall, IMS provided excellent environmental consulting services in the performance of this contract. They consistently delivered complete and well thoughout (sic) assessments of the sites under study. IMS personnel were very responsive to the needs of the Army in conducting this study. . . IMS personnel were very dedicated and went 'the extra mile' to ensure project success." The report noted that any difficulties were promptly corrected and the work was on time.

64. As well as reprisals for Contract 0004, racial prejudice is believed to have played a role in the inability of IMS to get work. The Corp's Hazardous Waste Chief, Christina Correale, told an IMS employee that IMS should send a white person to solicit work from the Corps, due to racial prejudice. Generally, Mr. Iqbal Singh met with Corps employees, and Mr. Singh is a member of the Sikh ethnic/ religious group. Mr. Singh has darker skin and wears a religiously mandated turban.

65. After the damage had been done under Contract 0046, the Baltimore District performance evaluation once again confirmed that there was no valid reason that IMS had been deprived of work orders. IMS's rating was "Excellent," IMS was recommended for future contracts, and no deficiencies were noted. The remarks stated "Overall, IMS Engineers – Architects provided excellent environmental consulting services in the performance of this delivery order. Their reports were well written and

prepared in accordance with all relevant regulatory requirements. This allowed the project to proceed without delay as a result of regulatory comments. The overall project management . . . was excellent. Information was always readily available to address regulatory concerns. IMS personnel were very responsive to the needs of the Army throughout the duration of the project. This ultimately led to the project being completed under budget and ahead of schedule."

66. When the end of Contract 0046 became imminent, IMS and the Federal SBA began an extensive campaign to have the Contract extended, in an attempt to mitigate the severe damage resulting from the Corps' failure to issue any significant task order work since September of 1994. However, the request for an extension was denied and the Contract expired on September 30, 1997.

67. As mentioned above, IMS was not issued a single task order against Contract 0046 since September 19, 1994, which is approximately when the informal decision was made to give the Contract 0004 work to M&P. Therefore, due to bad faith, IMS was not given any more task orders, even though they were available. Contract 0046 was being held hostage to settle Contract 0004 with the Huntsville Division and Baltimore District.

68. As a result of the bad faith actions of the Corps, IMS was awarded practically no work, which resulted in IMS's inability to maintain its staff and/or hire additional staff to grow. Therefore, as a result of the Corps' bad faith and discriminatory practices, it breached the duty of good faith and fair dealing under Contract 0046, and IMS has been damaged in the amount of three million seven hundred and forty six thousand, seven hundred and sixty five dollars ($3,746,765.00).

## COUNT 3

### VI. IMS WAS WRONGFULLY DEPRIVED OF WORK UNDER CONTRACT NO. DACA31-95-D-0057, BREACHING THE DUTY OF GOOD FAITH AND FAIR DEALING

69. Beginning in 1995, IMS had an identical problem with the same office on Contract DAC31-95-D-0057. The Contract was issued on June 30, 1995 as an 8(a) set aside and was an Indefinite Delivery, Architect-Engineer, Cost Reimbursement Type Contract for the purpose of performing various engineering/architecture services in support of Hazardous, Toxic Radioactive Waste work at various military and non-military locations within the Baltimore District, for a period of one year, with an option for an additional year. The guaranteed minimum was fifteen thousand dollars ($15,000.00) per year, with the allowable maximum contract amount of one million five hundred thousand dollars ($1,500,000.00) over the base and one option year.

70. However, as with Contract 0046, task orders awarded under this Contract were well below the stated maximum amount. The total amount of work given to IMS under Contract 0057, during both years, was only one hundred sixty six thousand seven hundred and ten dollars ($166,710.00); as with Contract 0046 orders were withheld, despite the availability of a substantial amount of work, and the fact that representations were made by Mr. William Ryals that additional work would be ordered.

71. Again, as stated above in reference to Contract 0046 with the Baltimore District, IMS believes that they were not given any Task Orders because the agency was attempting to prevent IMS from receiving any orders in hopes of strengthening their bargaining power in negotiations of a settlement on Contract 0004. Moreover, the SBA requested an extension of the Contract 0046, in order to try to mitigate the damages

suffered as a result of the lack of work ordered. However, in keeping with its continuous discriminatory and bad faith behavior, the request for the extension was denied.

72. IMS was notified by the Baltimore District on April 18, 1996 that it had been given a delivery order for seventy four thousand one hundred and fifty nine dollars and seventy cents ($74,159.70) under Contract 0057, for work in Lewes, Delaware. Considering the amount of the contract, this was a drop in the bucket, and upon information and belief, was only a tiny fraction of the available work.

73. On July 30, 1996, James O. Branch, the SBA Contracting Officer, wrote to the Chief of the Hazardous and Radioactive Waste Branch of Baltimore Division, stating that: "This letter is to certify the exceptional contract performance demonstrated by IMS engineers during the time that the firm was enrolled in the SBA 8(a) program." At the same time, the SBA requested that the contract be extended

74. Nonetheless, orders were not forthcoming, and Contract 0057 expired on June 30, 1997.

75. Therefore, as a result of the Corps' improper and bad faith actions in regard to Contract 0057, IMS is entitled to damages in the amount of two million seventy seven thousand two hundred and seventy six dollars ($2,077,276.00)

**WHEREFORE**, as a result of the above actions by the Army Corps of Engineers regarding Contract 0004, Contract 0046, and Contract 0057, IMS respectfully requests judgment in a sum of at least nine million one hundred fifty three thousand one hundred and seventy six dollars ($9,153, 176.00).

Dated: May 3, 2007

Respectfully submitted,

The Camardo Law Firm, P.C.

Joseph A. Camardo, Jr.
127 Genesee St.
Auburn, New York 13021
Tel: (315)-252-3846
Fax: (315)-252-3508