# In the United States Court of Federal Claims

No. 07-291C
(Filed June 26, 2009)

```
* * * * * * * * * * * * * * * * * * * * * *   *
                                              *
IMS ENGINEERS-ARCHITECTS,                     *   Contracts; summary judgment;
P.C.,                                         *   Indefinite Delivery, Indefinite
                                              *   Quantity contract; breach of
                Plaintiff,                    *   contract; breach of duty of good
                                              *   faith and fair dealing.
        v.                                    *
                                              *
THE UNITED STATES,                            *
                                              *
                Defendant.                    *
                                              *
* * * * * * * * * * * * * * * * * * * * * *   *
```

Joseph A. Camardo, Jr., Camardo Law Firm, Auburn, NY, for plaintiff.

Robert C. Bigler, Washington, DC, with whom was Assistant Attorney General Tony West, for defendant. Richard White, District Trial Attorney, and Christine Jacoby, Assistant District Counsel, U.S. Army Corps of Engineers, Baltimore, MD, of counsel.

## MEMORANDUM OPINION AND ORDER

**MILLER**, Judge.

    This case is before the court on defendant's motion for partial summary judgment and plaintiff's motion for summary judgment complete. Other than calling for rulings on the quotidian issues of burdens and inferences on summary judgment, defendant's motion seeks to eliminate claims related to two contracts in order to isolate them from the claim that the Government exercised bad faith in a continuing course of conduct stemming from an earlier contract. Plaintiff's cross-motion quixotically attempts to create a breach of a contract whereby the Government allegedly agreed to buy more than the minimum quantities under the two later contracts in order to atone for its bad faith associated with the earlier contract. Argument is deemed unnecessary.

**FACTS**

IMS Engineers-Architects, P.C. ("plaintiff"), is a consulting engineering firm with experience as a government contractor. Defendant's motion for partial summary judgment addresses two contracts between plaintiff and the Government, Contract No. DACA31-92-0046 ("Contract 0046") and No. DAC31-95-D-0057 ("Contract 0057"). A third earlier contract between parties, No. DACA87-92-C-0004 ("Contract 0004"), not the subject of defendant's motion, has potential significance based on the nature of plaintiff's complaint. Plaintiff moved for summary judgment on its claims under all three contracts.

On December 24, 1991, the Huntsville Division of the Army Corps of Engineers (the "Corps") awarded plaintiff Contract 0004 to conduct Resource Conservation and Recovery Act facility investigations at the Watervliet Arsenal ("Watervliet") in New York State. Contract 0004 was a fixed-price contract for $859,663.00. Subsequent modifications to the contract increased its value to $1,406,320.00.

Plaintiff was awarded Contract 0046 on September 30, 1992. Unlike Contract 0004, which was a fixed-price contract, Contract 0046 was an Indefinite Delivery, Indefinite Quantity ("IDIQ") contract. Contract 0046 had a minimum obligation of $100,000.00 and a maximum contract amount of $3 million. Between 1992 and 1994, plaintiff received multiple task orders totaling $654,665.00. Contract 0046 expired on September 30, 1997. Plaintiff earned high performance ratings for work under Contract 0046 and, at least on one occasion, after completion of a project order on April 10, 1994, garnered an "excellent" rating and was recommended for future contacts. Def's Resp. to Pl.'s Prop. Findings of Uncontr. Fact No. 12, filed May 1, 2009.

Plaintiff was awarded Contract 0057 on June 30, 1995. Like Contract 0046, Contract 0057 was an IDIQ contract. Contract 0057 had a minimum obligation of $15,000.00 and a maximum contract amount of $750,000.00. By Contract 0057's expiration in June 1997, the Corps awarded plaintiff two delivery orders under Contract 0057 that totaled $166,710.00 according to defendant, and $130,676.00 according to plaintiff.

Plaintiff's contention, which defendant asserts is unsupported by evidence, is that the Corps pressured plaintiff to work quickly and to complete Contract 0004 in a limited period of time. Plaintiff's performance under Contract 0004 was criticized in a subsequent audit report, published in February 1994, as follows:

> IMS['s] contract performance [under Contract 0004] was unsatisfactory; an on time completion would not be met; and that New York State and Environmental Protection Agency sanctions could occur . . . These

>contract file documentation comments indicate a potential for a default termination . . . .

Pl.'s Br. filed Apr. 3, 2009, App. 127 ("Pl.'s App."). In light of the criticism of plaintiff's performance on Contract 0004, a transfer of Contract 0004 to Baltimore, Maryland, and other factors, the Corps terminated plaintiff from all duties under Contract 0004.

A series of unsigned Corps internal communications regarding Contract 0004 lists events ultimately leading to the termination of plaintiff's involvement with, and the reassignment of, Contract 0004. On February 24, 1994, representatives from Watervliet, the Huntsville Division, and the Baltimore District of the Corps met to discuss "using an AE [architect/engineers] firm other than IMS to perform [Contract 0004]." Pl.'s App. at 148. On August 8, 1994, Watervliet formally requested that plaintiff be terminated on Contract 0004. Watervliet's request was communicated through an August 8, 1994 letter from Russell G. Wells, Director of Public Works at Watervliet, to the Corps Commander, requesting "your contract with IMS for all work at Watervliet Arsenal be terminated." Pl.'s App. at 160. The Commander of the Baltimore District of the Corps then requested proposals for the remaining Contract 0004 work from Malcolm-Pirnie ("MP"), a large company with prior experience working under similar contracts with the Corps.

On August 10, 1994, plaintiff's President, Iqbal Singh, met with Lieutenant Colonel ("LTC") Ralph H. Graves of the Baltimore District to discuss plaintiff's qualifications and to communicate its interest in continued work on Contract 0004. Plaintiff contends – an assertion defendant disputes as speculative and misleading, see Def.'s Resp. to Pl.'s Prop. Findings of Uncontr. Fact No. 25 – that during August 1994 plaintiff informally was told that Contract 0004 was going to be terminated. In response, on August 11, 1994, Mr. Singh sent the Corps a letter exhorting plaintiff's credentials in support of its ability to fulfill Contract 0004. Jim Sherman, an employee at Watervliet, forwarded Mr. Singh's letter to Corps Project Manager Charles R. ("Dick") Strong. On the facsimile cover sheet, Mr. Sherman wrote: "Our position is that Malcolm-Pirnie is our contractor and Baltimore is our executor." Pl.'s App. at 161. In an August 11, 1994 letter to Contracting Officer Danny J. Biggs of the Huntsville Division of the Corps, the Small Business Administration (the "SBA") suggested transferring Contract 0004 to the Baltimore District as preferable to termination. The August 11, 1994 letter from the SBA contains a handwritten note stating "you cannot terminate without going thru the SBA, must have strong supporting documentation." Id. at 163.

LTC Graves wrote two notes in response to the SBA's August 11, 1994 letter. One note to COL Randall R. Inouye, states:

3

>   I have talked to you about this one. Despite [the August 11, 1994 SBA letter], we intend to switch to Malcolm Pirnie for the work [under Contract 0004] at Watervliet. We will try to soften the blow by arranging for IMS to be a sub to MP. We will inform SBA of our decision.

Id. at 164. LTC Graves wrote another note, dated August 22, 1994, to Corps Contracting Officer M. Catherine Robertson. "Now that SBA has sent us a letter, we need to answer. As you prepare the letter for Huntsville we discussed Friday, also prepare a version for COL Inouye's signature in answer to the attached." Id. at 165. In connection with the note suggesting to "soften the blow" to plaintiff, another note, dated August 19, 1994, from Contracting Officer William C. Ryals, to Greg Mathews of MP, stated that it was "a go to use our recommended 8(a) sub[contractor] at Water[vliet] NY." Id. at 167. Also, on August 19, 1994, MP offered to pay plaintiff for approximately one-quarter of the work at Watervliet, previously under Contract 0004, if plaintiff agreed to act as subcontractor. On August 31, 1994, before plaintiff responded to MP's offer, the SBA wrote another letter to the Corps, stating, in relevant part:

>   It is well documented on this contract [Contract 0004] and numerous others that IMS, performs in a professional and satisfactory manner, with no documented delays. IMS, P.C. has our full support. This office is not aware of any information that would justify the termination of this contract.
>
>   The major concern here is the proposal to terminate IMS and assign the remainder of the work on this project to a large business [MP]. The two alarming issues are [these]: That the U.S. Army Corps of Engineers, or any agency would take such measures, to the detriment of a small business, without sound justification, and, assign the work to the task order of a large business concern without competition.
>
>   This proposal appears to contradict many federal acquisition guidelines. We are requesting that IMS be permitted to complete this project under the terms and condition of the existing contract [(Contract 0004)].

Pl.'s App. at 168. Plaintiff rejected MP's offer to act as a subcontractor on September 2, 1994. Contract 0004 officially was transferred from the Huntsville Division of the Corps to the Baltimore District on September 30, 1994.

Defendant disputes plaintiff's allegation that the Government has been unable to produce any documentation to show deficient performance by plaintiff under Contract 0004. Defendant counters that an Audit Letter Report covering the subject contract issued on

4

February 2, 1998, Pl.'s App. at 122-43 – characterizing plaintiff's contract performance as "unsatisfactory," predicting that an on-time completion would not be met and that sanctions could occur, and containing 99 pages of comments on deficiencies by the State of New York – constitutes documentary support of plaintiff's substandard performance on Contract 0004. Plaintiff describes the Audit Letter Report as evidence that the Corps based its decision to replace plaintiff on reasons other than performance. Plaintiff highlights language stating "IMS was not the first choice contractor of USACE staff or our customers and at times their timeliness was questioned. However, formal USACE performance appraisals rated IMS work acceptable or better." Pl.'s App. at 123.

Plaintiff asserts that the Corps replaced it with MP out of "animus," specifically towards Mr. Singh and foreign workers employed by plaintiff. Pl.'s Prop. Findings of Uncontr. Fact Nos. 37, filed Apr. 3, 2009; see also Nos. 38-41. Plaintiff cites a handwritten memorandum dated August 31, 1994, with notes from a telephone call with Mr. Sherman at Watervliet: "IMS is hard to negotiate w[ith], change orders are overpriced, [IMS] employs non-US citizens that must be escorted at WVA & they do not have the manpower to do this extra effort . . ." Pl.'s App. at 170.

While agreeing that this language is included, defendant justifies concerns about non-United States employees of plaintiff based on defendant's response to an interrogatory:

> Because of its national defense mission, the Watervliet arsenal is deemed a secure facility, requiring non-citizen contractors to be escorted about the premises by authorized Government representatives. Representatives from Watervliet explained that some employees of IMS were foreign nationals and, thus, were unable to get the security clearances necessary to access the site without escorts. Watervliet lacked the manpower necessary to escort IMS personnel whenever needed.

Def.'s Resp. to Interrog. No. 5, Pl.'s App. at 11-12. Plaintiff counters that no proof has been offered that its employees were ever escorted at Watervliet, or that there was an escort policy at Watervliet prior to 2002. In response defendant references a fact sheet – "IMS Engineers' Contract at Watervliet Arsenal," dated March 1, 1995, with a bullet stating:

> On 31 August 1994, Chris Correale spoke with Jim Sherman, Project Officer-WVA. Mr. Sherman indicated that IMS is hard to negotiate with, change

5

> orders are overpaid, employs non-U.S. citizens that must be escorted at WVA and WVA does not have the manpower to do this extra effort. [1/]

Pl.'s App. at. 155-56. Although plaintiff had employees of foreign birth or Asian decent, plaintiff asserts that all employees at Watervliet were United States citizens or legal permanent residents. Affidavit of Iqbal Singh, Apr. 3, 2009, ¶ 26. Mr. Singh avers that he traveled to Watervliet several times and only recalled workers and visitors having to sign in. Id. ¶ 27.

Plaintiff refers to a series of correspondence as evidence that the Corps unjustifiably refused to work with plaintiff. According to plaintiff, a Corps e-mail dated August 31, 1994, illustrates an intent to deceive the SBA regarding the Corps's plan to take work away from plaintiff:

> Penny Cincibus, Assistant to Pat Huber, received a call from Jim Branch, who is the KG with SBA on the IMS contract on 29 Aug. He is very upset and "appears" to be leaning towards making lots of trouble for us if we do not take the IMS contract. He indicated nobody has convinced him as yet, why IMS should not be given this work. He is also very upset that we would go to a LARGE BUSINESS contractor in lieu of the awarded 8(a) for the work I also told him this was not a contracting decision and made at levels above us. My position on this is to try and convince SBA that we are trying to avoid any economic problems for IMS which is the reason we have Malcolm trying to negotiate with them on doing this work. So far, SBA has not been convinced on this issue.

Pl.'s App. at 171. Plaintiff also cites to a September 1, 1994 e-mail captioned "The Continuing Saga of IMS vs Malcolm," sent by Contracting Officer Robertson. Pl.'s App. at 174. Plaintiff focuses specifically on one paragraph:

> WHAT A MESS!! Jerry spoke with Mr. Jim Reynolds yesterday. He is the Director of Contracting for HND. Mr. Reynolds indicted they do not have a strong position to T4D [terminate for default] nor can they support a T4C

---

1/ Defendant relies on language from Pl.'s App. at 156 as proof of an escort policy at Watervliet. However, once plaintiff relies on the same fact sheet, defendant dismisses it because the document "has not been authenticated nor signed by an author," but does not dispute that the language appears in the document. Def.'s Resp. to Pl.'s Prop. Findings of Uncontr. Fact No. 43.

> [terminate for cause] since the requirement for the work at WVA is still necessary. However, Mr. Reynolds indicated they would not transfer the contract to BDO if we did not want it. Mr. Biggs, Sherry Higgins, HND Office of Counsel, and Mr. Reynolds are meeting on this issue this afternoon. . . . In the meantime, the clock ticks . . . .

Pl.'s App. at 174.

Plaintiff calls attention to the mention of Mr. Biggs of MP and LTC Graves and COL Inouye in the September 1, 1994 email, thus showing that this decision was made at the highest levels of the Corps.

A different September 2, 1994 e-mail from Christina E. Correale, Hazardous Waste Chief of the Baltimore District, communicated that Jeff Bennett, the Vice President of MP, had called to inform the Corps that plaintiff had refused MP's offer to serve as a subcontractor. A September 7, 1994 e-mail from LTC Graves to Contracting Officer Robertson stated, "We still need to send a letter over COL Inouye's signature to Mr. Branch of SBA telling our intention on IMS." Pl.'s App. at 176. A September 12, 1994 letter from COL Inouye to Elizabeth J. Perno of the SBA explains why Contract 0004 was transferred from plaintiff to MP:

> While we cannot meet the needs of our customer by taking over the IMS contract from Huntsville division, we very much want to contract through the Small Business Administration with IMS for other work in the area during the coming Fiscal Year.
>
> . . . .
>
> Meanwhile, we and the installation have largely revised the workplan submitted by IMS and negotiated approval from regulators. This revised plan will be substantially less expensive than the one proposed by IMS. We shall award a delivery order for the investigation described in the revised workplan to Malcolm-Pirnie (a competitively awarded contract through our A-E selection procedures) with expiring money before the end of September. To modify the IMS contract to perform the revised workplan would take several months, placing the installation in violation of its consent agreement and risking large fines.
>
> . . . .

7

> We encouraged Malcolm-Pirnie to offer a subcontract to IMS, but apparently IMS did not consider the opportunity favorably. We are always interested in doing business with qualified 8(a) firms, and therefore you will soon receive an offering letter recommending IMS as a candidate for an indefinite-delivery contract with the Baltimore District for environmental work in the New York area . . . . [w]e look forward to doing other work with you and with IMS in the coming year.

Pl.'s App. at 177-78.

Plaintiff emphasizes that these letters weave a pretense that plaintiff was terminated because of a change of scope in the contract and cites to a Government Chronology of Documented Significant Events recording that, in September of 1994, "Malcolm-Pirnie is awarded six Delivery Orders totaling $1.1 Million [] by Baltimore District. The scopes of work are essentially the same as the IMS contract scope of work." Pl.'s App. at 144. By Mod P00005, dated September 13, 1994, Contract 0004 formally was transferred from the Huntsville Division to the Baltimore District.

Plaintiff did not agree to a termination settlement until October 8, 1996. Plaintiff also signed a termination modification on November 14, 1996, and a subsequent release on December 23, 1996. During plaintiff's search for government contract work to replace the value of the remaining work on Contract 0004, plaintiff claims that it was "blacklisted" by the Corps, Pl.'s Prop. Findings of Uncontr. Fact No. 61; adversely affected by "personal animus" to plaintiff by the SBA, id. No. 72; and dealt with by the Corps in a "cynical nature," id. No. 78. Moreover, plaintiff suggests that racial prejudice played a role in plaintiff's inability to secure work, because Mr. Singh is a Sikh with "darker skin and wears a religiously mandated turban." Singh Aff. ¶ 61. As support plaintiff refers to the project orders issued under Contract 0046 and Contract 0057 and a series of communications leading up to the official settlement and termination agreement for Contract 004.

Although defendant characterizes other contracts as irrelevant to any contract at issue in this litigation, plaintiff argues that the contracts awarded to plaintiff's peer contractors between 1994 and 1997 constitute evidence of bias against plaintiff. Plaintiff charges that the Corps exceeded the allowable amount in a contract with a firm called Plexus and that the Corps reached the limit with another firm called Horne Eng, both contract awards above $4 million. See Singh Aff. ¶ 65.

Plaintiff produces a number of internal communications within the Corps that address how the Corps planned to deal with plaintiff. A September 20, 1994 note from Contracting Officer Robertson states that the Corps "need[s] to discuss what/how we are going to T4C

[terminate for convenience] this contract." Pl.'s App. at 182. A September 26, 1994 memorandum from Ms. Correale to Patricia A. Huber, an SBA advocate, suggests that the Engineering Division and Ms. Robertson agreed that plaintiff should get a new contract "structured with a maximum of $750k total per year for the base year and one option year at a maximum of $750k and a maximum of $150k delivery orders." Pl.'s App. at 183. In a September 30, 1994 letter to the SBA, Ms. Huber recommended award to plaintiff. The SBA accepted the offer on behalf of plaintiff in an October 5, 1994 letter.

Acknowledging that Contract 0004 had yet to be terminated, LTC Graves wrote a letter to COL Inouye discussing the disposition of Contract 0004 and plaintiff:

> As you remember, this contract has been superceded by an award we made to Malcolm-Pirnie for the work at Watervliet. We intend to Terminate [plaintiff], but haven't done so yet. We are working with SBA to give [plaintiff] a new 1.5M IDTC [Indefinite Delivery Type Contract]. I guess Singh is coming in to argue again for the Watervliet contract. He didn't convince me, and now its OBE.

Pl.'s App. at 189. Manifesting no knowledge that plaintiff would be terminated, Mr. Singh wrote a November 17, 1994 letter to COL Inouye to discuss the transfer of Contract 0004. Id. at 190. Mr. Singh also wrote a November 28, 1994 letter to Contracting Officer Robertson expressing concern with the lack of understanding within plaintiff's organization and the potential for "a life time loss" for plaintiff. Id. at 191. Plaintiff insists that during this period "IMS could not get a single task order." Singh Aff. ¶ 32.

On November 22, 1994, Mr. Singh and LTC Graves met to discuss Contract 0004. According to Mr. Singh, LTC Graves indicated that the decision to terminate the contract already had been made and that the issue was whether plaintiff preferred a termination for convenience or award of work in exchange for losses suffered. Singh Aff. ¶ 36. Plaintiff "could see the writing on the wall," and asked for more work citing $8 - $10 million as the amount needed to cover plaintiff's losses. Id. Defendant strongly disagrees with plaintiff's account of the meeting and refers to a November 22, 1994 internal e-mail to members of the contracting office in which LTC Graves set forth his comments about the meeting.

> Mr. Singh paid a visit today. We mentioned our options on the Watervliet contract:
>     a. T for C [termination for convenience]
>     b. Partial deletion
>     c. Out-of-scope mod (this is a negotiated 8a contract) to perform other work somewhere else.

Mr. Singh said that he would most prefer option "c." Let's try to find some other work we can "substitute" in his contract. (This is in addition to the IDTC we are offering.)

Pl.'s App. at 193. A November 22, 1994 e-mail from Ms. Correale to Ms. Robertson stated:

Dick [Charles R. Strong, of the Baltimore District] will call the PM in Huntsville to get the funds on the existing IMS contract transferred to us.

Dick is also going to look over our program to find out if there are any projects in addition to the ones we already planned for the IMS IDTC to use for an out of scope mod on their existing contract.

Pl.'s App. at 194. A November 23, 1994 e-mail from Ms. Robertson indicated that money relating to Contract 0004 was being transferred from Huntsville to Baltimore, that at that point a "bona fide need for the work" still existed, but "with a different contractor," and that termination of plaintiff would cause the Corps to lose money. Id. at 196. An undated note, surmised by plaintiff to have been created on or about November 28, 1994, see Pl.'s Prop. Findings of Uncontr. Fact No. 73, from LTC Graves states, "Per our discussion, let's redo to capture our whole plan," Pl.'s App. at 197. A December 3, 1994 note from Ms. Robertson to LTC Graves states,

We have a good course of action mapped out. Just need to carry it out . . . I had an interesting conversation w[ith] Jim Branch at SBA. Seems they are fed up w[ith] this firm. I also have the letter to respond to that Singh wrote to Col Inouye. Will prepare one response to both letters.

Pl.'s App. at 199.

Mr. Singh wrote a letter dated December 8, 1994, to LTC Graves, recounting discussion points from various meetings and outlining what Mr. Singh viewed as the risks plaintiff faced due to being unable to complete Contract 0004. He stated the following: "You assured me that the Baltimore District is fair and equitable and IMS will be treated fairly." Pl.'s App. at 203. On December 13, 1994, LTC Graves handwrote a memorandum stating:

Mr. Singh doesn't seem to want to hear our answer. As I understand it, our course of action is
   1. To seek entering into an IDIQ with IMS.

10

>    2. To use the remaining "capacity" in the Watervliet contract to do work elsewhere in New York (as opposed to T for C).

Pl.'s App. at 204. A subsequent letter dated "12/16" to COL Inouye from LTC Graves stated:

>    This guy comes in and I tell him what we're doing and he says "OK" and then he goes home and writes another unhappy letter. SBA is quite tired of him. CT is preparing a letter re-iterating our position:
>    1. Modify the Watervliet contract to give him new work somewhere else (as opposed to T for C, which he doesn't want).
>    2. Give him an 8a IDTC.
>    We are being more than fair.

Pl.'s App. at 205. On January 10, 1995, the Corps March 1, 1995 fact sheet indicated that the Baltimore District received a proposal from plaintiff for a new contract and that the award was in the review process. Id. at 157.

A February 13, 1995 e-mail from Ms. Correale to Mr. Strong ordered preparation of a new Fact Sheet because plaintiff had contacted "BG Stevens" complaining of plaintiff's treatment by the Corps. Id. at 208. Along with a handwritten note "see me," signed "Dick," on this e-mail, were notes of a draft fact sheet:

>    1. Huntsville Contract for work at Watervliet contract Amount-Amount Obligated.
>    2. Work transferred to NAB July/Aug 94.
>    3. Decision made to use MP in lieu of IMS for following reasons
>         1. [blank]
>         2. [blank]
>    4. IMS advised that MP would entertain using IMS as Sub for the work.
>    5. IMS arrogant in that they wanted all the work. MP backed off.
>    6. IMS met with COL Graves Oct/Nov 94 . . . M.P. told IMS that District would offer them a 750K IDTC for work in our Division.

Id.

As recounted previously, Contract 0057 was awarded to plaintiff on June 30, 1995. Contract 0057, also an IDIQ contract, guaranteed a minimum of $15,000.00 and a maximum of $1.5 million. Plaintiff interpreted this contract as the "'new'" IDIQ contract that the Corps had "promised" to compensate plaintiff for lost profits from Contract 0004. Singh Aff. ¶ 41.

Defendant does not dispute plaintiff's subjective interpretation, but denies any legal obligation to award any contact for lost work from Contract 0004.

Clause G-1 of Contract 0057 incorporates 48 C.F.R (FAR) 16.504; FAR 16.504(a)(4)(iv), as of October 1, 2995, requires that an IDIQ contract:

> [s]tate the procedures that will be used in issuing orders and, if multiple awards may be made, state the procedures and selection criteria that will be used to provide awardees a fair opportunity to be considered for each order (see 16.505(b)(1).

The parties disagree as to the applicability of FAR 16.505(b)(1) to this contract. Defendant contends that regulation is inapplicable to single- award IDIQ contacts. FAR 16.505(b)(1) (1995) provides:

> [E]xcept as provided for in paragraph b(2) of this section, for orders issued under multiple delivery order contracts or multiple task order contracts, each awardee shall be provided a fair opportunity to be considered for each order in excess of $2,500. In determining the procedures for providing awardees a fair opportunity to be considered for each order, contracting officers shall exercise broad discretion and may consider factors such as past performance, quality of deliverables, cost control, price, cost, or other factors that the contracting officer, in the exercise of sound business judgment, believes are relevant to the placement of orders.

A Corps document on Contract 0004 titled "Summary," dated March 1, 1996, contains a bullet list of information regarding plaintiff's performance on Contract 0004:

- Insufficient documentation to support Termination for Default
- Termination for Convenience of the Government is the only viable option
- IMS, P.C. must be compensated
- IMS, P.C. could claim the remainder on the contract ($1M) plus damages
- Recommend that the District resolve the termination as expeditiously as possible
- Recommend that the District extend all possible help to Mr. Singh
    - Monthly progress reports
    - Regular meeting with DE
- Contract funds expire on 30 Sep 97

Pl.'s App. at 152.

On March 3, 1996, Contracting Officer Ryals issued a formal stop-work order to plaintiff regarding Contract 0004. On March 25, 1996, Contracting Officer Ryals sent a formal termination letter to the SBA regarding Contract 0004.

Plaintiff wrote several letters to the Corps to express its disappointment with plaintiff's relative lack of success in securing contracts. One April 1, 1996 letter to COL Daniel F. Uyesugi stated: "We do however, observe that some of the more fortunate firms have been able to participate to their full capacity and much more." Pl.'s App. at 232-34.

Plaintiff was issued a delivery order for $74,159.70 under Contract 0057 on April 18, 1996. A July 30, 1996 letter from James O. Branch, the SBA Contracting Officer, asked the Corps to certify "the exceptional contract performance demonstrated by IMS Engineers during the time that the firm was enrolled in the SBA 8(a) program." Pl.'s App. at 218.

Plaintiff negotiated a termination for convenience of Contract 0004 on October 3 and 8, 1996. The minutes of those meetings reflect that "Col. Graves had stated to Mr. Singh, just what is it that you would like the work or the money. Mr. Singh again stated that he has been waiting for 2 ½ years to do the work. Now it has been a total of 3 years." Pl.'s App. at 222. Mr. Singh agreed to a termination settlement on October 8, 1996. Plaintiff asserts, and defendant strongly disagrees with plaintiff's interpretation of the October 8, 1996 Corps memorandum quoted by plaintiff, Pl.'s App. at 226-27, that the agreement was "prompted and induced by the Government's implication that IMS would be fairly considered for more work in the future," Pl.'s Prop. Findings of Uncontr. Fact No. 106.

Plaintiff signed a termination modification on November 14, 1996, under what plaintiff claims was "intense pressure." Pl.'s Prop. Findings of Uncontr. Fact No. 107 (citing Singh Aff. ¶¶ 53-55). Plaintiff insists that the termination was "procured by fraud and duress, and must be considered void." Pl.'s Prop. Findings of Uncontr. Fact No. 107. Plaintiff further contends that, as of November 14, 1996, it had no idea how MP had obtained Contract 0004 and never would have agreed to the termination had plaintiff known then what it now knows. Id. No. 108 (citing Singh Aff. ¶ 55).

Contract 0046 expired on September 30, 1997. Contract 0057 expired on June 30, 1997. Plaintiff claims to have been awarded only $130,676.00 under Contract 0057 and that orders under Contract 0046 purposely were withheld from plaintiff. Defendant asserts that $166,710.00 was awarded under Contract 0057, which exceeded the minimum, so that the Corps was not obligated to issue any additional task orders to plaintiff.

Defendant maintains that the majority of plaintiff's proposed facts are immaterial because the Corps paid $499,999.00 in termination costs, bringing the total amount paid to

13

plaintiff under Contract 0004 to $855,949.90. Defendant also relies on a release signed by Mr. Singh on December 23, 1996, that recited, in pertinent part:

> The work under Contract Number DACA87-92-C0004, dated December 24, 1991 between the United States of America, represented by William C. Ryals Contracting Officer, and the undersigned contractor, having been completed and finally accepted, the United States, its officers and agents, are hereby released from all claims and demands whatsoever arising under or by virtue of said contract, except as follows: (If none, so state.) None

Def.'s Br. filed May 1, 2009, App. at 3. Defendant contends that this signed release waived any claim relating to Contract 0004.

Plaintiff attributes the cessation of task orders under Contract 0046 to the problems experienced with Contract 0004. Upon information and belief, plaintiff characterizes the halt in work orders as a "deliberate reprisal" and "not a coincidence." Pl.'s Prop. Findings of Uncontr. Fact No. 54.

Plaintiff filed its complaint on May 9, 2007. On March 3, 2009, defendant moved for partial summary judgment, to which plaintiff replied and cross-moved for summary judgment on April 3, 2009. Briefing was completed on May 21, 2009.

**DISCUSSION**

I. Cross-motions for partial summary judgment and summary judgment

    1. Standard of review

RCFC 56(c) allows the court to grant a motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The benefit of all presumptions and factual inferences runs in favor of the non-moving party when a court reviews a motion for summary judgment, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986), and the party moving for summary judgment bears the initial burden of demonstrating the absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To combat a movant's proposed absence of material fact, a respondent must establish that there is a genuine issue of material fact, beyond some "metaphysical doubt," that is a "genuine issue for trial." Matsushita, 475 U.S. at 586-87 (internal quotations omitted).

14

When cross-motions for summary judgment are presented, the court evaluates each motion on its own merits and resolves all doubts and inferences against the party whose motion is being considered. Mingus Const. Inc. v. United States, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). The court will deny both motions if, upon the required analysis, a genuine issue of material fact exists. Id.

### 2. Good faith and fair dealing under Contract 0004

Plaintiff moved for summary judgment on Count 1 asserting that the Corps breached the duty of good faith and fair dealing when plaintiff was wrongfully deprived of work under Contract 0004. The breach activity was the Corps's diversion of work under Contract 0004 to MP through various task orders, thus abrogating the Corps's duty to cooperate and hindering and delaying plaintiff's ability to complete performance. To camouflage the Corps's improper diversion of work, plaintiff argues, the Corps improperly and belatedly terminated plaintiff for convenience. Plaintiff further alleges that the Corps "directly li[ed] to and deceiv[ed]" plaintiff" and demonstrated prejudice against plaintiff because it employed foreign workers. Pl.'s Br. filed Apr. 3, 2009, at 19.

Plaintiff proffers e-mail correspondence, several memoranda, and an affidavit from Mr. Singh as support. Documents and correspondence quoted by plaintiff excite a high level of suspicion regarding the Corps's actions in the administration of Contract 0004. An undated Corps document entitled "Questions which may be asked," states that the Corps has "no documentation" to support plaintiff's termination and that "the Corps handling of this contract was very poor. Making a public case of it would be very embarrassing." Pl.'s App. at 146. In addition, Mr. Singh expresses his "surprise" that the Corps would not allow plaintiff to complete Contract 0004 and further describes his frustration with what he perceived as the Corps's promise of extra work to make up for lost profits under Contract 0004, but never offering the volume or workflow that Mr. Singh expected. Singh Aff. ¶¶ 15, 37. Mr. Singh documents instances where Corps employees led him to believe that work and money were coming through work orders, specifically through Contracts 0046 and 0057, but never materialized. Id. ¶¶ 37-38, 52-53.

Defendant does not dispute any of the documented facts alleged by plaintiff, but contends that plaintiff waived all actions under Contract 0004 upon signing a release on December 23, 1996. 2/ Defendant adds that the Corps remitted a payment of $499,999.00

---

2/ The release recites:

> The work under [Contract 0004], dated December 24, 1991 between the United States of America, represented by William C. Ryals Contracting Officer, and the undersigned contractor, having been completed and finally

15

to plaintiff for termination costs at the time the release was signed. The signed full release effectively released all claims relating to Contract 0004, thereby defeating plaintiff's motion for summary judgment.

Plaintiff intones that the release is null and void because it was signed under "duress and falsehoods." Pl.'s Br. filed May 21, 2009, at 10-11. Plaintiff elaborates that it was under economic duress to the extent that plaintiff "had no choice but to accept the Government's terms." Id. at 12. Plaintiff also represents that Mr. Singh agreed to sign the release under the belief that the Corps would consider increasing the amount of Contract 0057 and that plaintiff would be fairly considered for other future work orders. Based on the Government's dearth of evidence, Mr. Singh's affidavit, and plaintiff's documentary evidence, plaintiff asks for a grant of summary judgment in its favor.

Plaintiff bears the initial burden of demonstrating the absence of genuine issues of material fact under the circumstances surrounding Contract 0004's reassignment and termination. Celotex, 477 U.S. at 323. To prove that the Corps breached Contract 0004, plaintiff must show by a preponderance of the evidence the manner in which the breach occurred. In addition, plaintiff has the "very weighty" burden to overcome the presumption that public officials act "conscientiously in the discharge of their duties," a burden "rarely succeeded in demonstrating," to prove that the Government acted in bad faith. Krygoski Constr. Co., v. United States, 94 F.3d 1537, 1541 (Fed. Cir. 1996) (quotations and citations omitted).

Plaintiff has put forth more than minimal evidence suggesting that the Corps diverted work, acted suspiciously, and made a plurality of questionable decisions and representations that may overcome the release that plaintiff signed. However, with Mr. Singh's affidavit, plaintiff has drawn the contours of a possible basis for recovery, but has not met the burden of demonstrating the Corps's liability and the amount of damages as a matter of fact and law, and therefore cannot prevail on summary judgment for Count 1 seeking recovery under Contract 0004.

---

2/ (Cont'd from page 15.)

> accepted, the United States, its officer and agents, are hereby released from all claims and demands whatsoever arising under or by virtue of said contract, except as follows: (If none, so state.) None

Def.'s Br. filed May 1, 2009, App. at 3.

### 3. Good faith and fair dealing under Contracts 0046 and 0057

The parties filed cross-motions for summary judgment on Counts 2 and 3 of the complaint. These counts relate to Contract 0046 and Contract 0057, two IDIQ contracts between plaintiff and the Corps.

It is undisputed that Contract 0046 was an IDIQ contract with a minimum of $100,000.00 and that Contract 0057 was an IDIQ contract with a minimum of $15,000.00. It is also undisputed that the Corps placed orders above the minimum requirements under both Contract 0046 and 0057. 3/ Because the Corps met minimum requirements under Contract 0046 and Contract 0057, defendant insists that plaintiff was not entitled to any further business and that the very nature of an IDIQ contract preempts any remedy at law for "los[ing] [plaintiff's] gamble" that the contracts would yield far more than the stated contract minimum. Def.'s Br. filed Mar. 3, 2009, at 6.

In citing Varilease Tech. Group Inc., v. United States, 289 F.3d 795 (Fed. Cir. 2002); Travel Centre v. Barram, 236 F.3d 1316 (Fed. Cir. 2001); and Dot Sys. v. United States, 231 Ct. Cl. 765 (1982), defendant argues that the Corps had no legal responsibility to provide work beyond the stated minimums under Contracts 0046 and 0057 and, more definitively, that plaintiff has no legal basis to pursue damages for expected additional work after the stated minimums were exceeded.

Plaintiff submits that these cases do not control when the Corps failed to give fair consideration to plaintiff in placing orders under Contracts 0046 and 0057 and thereby acted in bad faith and breached its duty of good faith and fair dealing.

Plaintiff's primary contention is that the Corps promised to award work under Contracts 0046 and 0057 to compensate for the Corps's alleged breach of Contract 0004, but ultimately failed to fulfill that promise. According to plaintiff, the key representations were made to plaintiff during the parties' oral negotiations in 1996 to settle plaintiff's claims related to termination of Contract 0004. Suggestive record evidence appears in a Price Negotiation Memorandum dated October 8, 1995, after price negotiations had taken place between plaintiff and the Corps:

---

3/ Defendant states that orders valued at $166,710.00 were placed under Contract 0057, while plaintiff pus the total at $130,676.00. This difference is immaterial for the purposes of disposition, as both are above the $15,000.00 minimum amount under Contract 0057. Pl.'s Resp. to Def.'s Prop. Findings of Uncontr. Fact No. 3.

17

> Mr. Sing [sic] indicated that he would drop the interest costs if we would increase the value of the current IDTC from $750,000 to $5M. The contracting officer said that he would "consider" the issue but there would be no guarantee. The IDTC has a maximum limit and the minimum guaranteed value of work would remain at $15,000 . . .

Pl.'s App. at 226.

Plaintiff argues that the Corps violated FAR § 49.102(a), a provision laying out the procedure for a termination for convenience or default. This approach is misguided as applied to Contracts 0046 and 0057, as they were not terminated for convenience or default. Plaintiff attempts to use the Corps's behavior regarding Contract 0004 to overcome defendant's arguments that focus squarely on the nature of IDIQ contracts, and thereby to render relevant the particular relationship and prior dealings between the parties in this case.

The Federal Circuit has held that an IDIQ contract only promises a minimum purchase obligation. See Varilease, 795 F.3d at 799 (explaining that "An ID/IQ contract differs from a requirements contract in that the former does not oblige the buyer to purchase more from the seller than a stated minimum quantity[.]"); see also Travel Centre, 236 F.3d at 1319 (stating that IDIQ contract "provides that the government will purchase an indefinite quantity of supplies or services from a contractor during a fixed period of time, it requires the government to order only a stated minimum quantity of supplies or services." (emphasis added)). Even when the Government represents to a contractor that business in excess of the minimum should result from the IDIQ contract, once the minimum purchase obligation has been met, additional assignments to the contractor are at the discretion of the Government. Travel Centre, id. (finding no fault in Government's "less than ideal contracting tactics" when solicitation for IDIQ contract with minimum purchase threshold of $100.00, had figures estimating $2.5 million per year profit from contract, and Government stopped using contractor after $500,000.00 of gross sales).

The Corps exceeded the minimum obligation under both Contract 0046 and Contract 0057. Despite any oral representations to the contrary, the parties are bound by the provisions of their IDIQ contracts. As in Travel Centre, the Corps's actions can be characterized, at least at this stage of review, as "less than ideal contracting tactics," but do not alter the form and function of the IDIQ contracts. Id. at 1319.

Defendant's motion for partial summary judgment is granted with respect to Counts 2 and 3. However, the facts pertaining to the Corps's conduct in the context of Contracts 0046 and 0057 is not erased from the larger picture of this action. This award of partial summary judgment is not a final judgment in this case. See RCFC 52(b). Plaintiff and

defendant should be aware that the facts surrounding Contracts 0046 and 0057, as they relate to Contract 0004, may be relevant to Count 1 insofar as plaintiff has alleged a pretextural termination.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1.  Defendant's motion for partial summary judgment is granted insofar as defendant has established its entitlement to judgment in its favor on Counts 2 and 3 of the complaint.

2.  Plaintiff's cross-motion for summary judgment is denied.

3.  The parties shall file a Joint Status Report by July 27, 2009, proposing a schedule for all pretrial filings and a date for the pretrial conference. Trial on Count 1, not to exceed five days, shall commence at 10:00 a.m. on Monday, December 14, 2009, in the Court of International Trade, One Federal Plaza, New York, NY.

4.  Any additional dispositive motion shall be filed before October 20, 2009, and briefing will be expedited to conclude within thirty days.

s/ Christine O.C. Miller
_____
**Christine Odell Cook Miller**
Judge