# In the United States Court of Federal Claims

No. 07-291C
(Filed March 18, 2010)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * | * | |
| | * | |
| **IMS ENGINEERS-ARCHITECTS,** | * | Contracts; breach of duty of |
| **P.C.,** | * | good faith and fair dealing; |
| | * | judgment on partial findings, |
| Plaintiff, | * | RCFC 52(c); damages for |
| | * | finance charges; validity of |
| v. | * | release; claim of fraud or |
| | * | economic duress in obtaining |
| **THE UNITED STATES,** | * | release; claim of post-release |
| | * | consideration of claims. |
| Defendant. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * | * | |

<u>Joseph A. Camardo, Jr.</u>, Camardo Law Firm, Auburn, NY, for plaintiff.

<u>Robert C. Bigler</u>, Washington, DC, with whom was <u>Assistant Attorney General Tony West</u>, for defendant. <u>Richard White</u>, District Trial Attorney, and <u>Christine Jacoby</u>, Assistant District Counsel, U.S. Army Corps of Engineers, Baltimore, MD, of counsel.

## MEMORANDUM OPINION AND ORDER

<u>**MILLER**</u>, Judge.

This case is before the court after trial, during which the court granted defendant's motion for partial findings under RCFC 52(c) with respect to a claim for financing costs as an element of damages. In order to assert a claim against the Government for breach of the implied duty of good faith and fair dealing, plaintiff sought to set aside a release of all of its claims executed in 1996. The court previously denied summary judgment for plaintiff on liability, noting the existence of genuine issues of disputed facts concerning the circumstances attending the execution of the release. <u>See</u> <u>IMS Engr's-Architects, P.C. v. United States</u>, 87 Fed. Cl. 541, 553 (2009) (granting summary judgment for defendant with respect to two other contracts and denying plaintiff's motion on liability). The facts bearing on the release had to be resolved in plaintiff's favor before plaintiff was entitled to an

adjudication of its claim for breach.  Trial determined that plaintiff could not carry its burden of proof to overcome the full release of the claim that it sought to advance in this action.  1/

# FACTS

IMS Engineers-Architects, P.C. ("plaintiff" or "IMS"), is a consulting engineering firm based in New York State with experience as a government contractor.  Plaintiff's president is Iqbal Singh, a professional engineer licensed in New York, New Jersey, and Pennsylvania.  Mr. Singh founded his company in 1982 to do advanced work in environmental engineering.  See Transcript of Proceedings, IMS Engr's-Architects, P.C. v. United States, No. 07-291C, at 53 (Fed. Cl. Dec. 14-17, 2009) ("Tr.").  Mr. Singh, a native of India and a Sikh, holds a Masters of Science degree in environmental engineering.  He is a proud gentleman with many accomplishments in which to take pride, including his own educational and professional achievements, as well as those of his wife and two children. The court was impressed with Mr. Singh's enthusiasm for his scientific discipline and for plaintiff's capabilities.  Mr. Singh viewed as recognition of plaintiff's relative standing among its peers the 1992-1997 listing by the Division of Hazardous Waste Remediation, New York State Department of Environmental Conservation, that ranked plaintiff fifth out of twenty-five consulting engineering firms qualified to bid on state contracts for engineering and technical services in connection with inactive hazardous waste sites.  Notwithstanding the court's positive impression of Mr. Singh as a person, he was a poor witness for plaintiff—vague, impressionistic, inconsistent, and given to exaggeration.  This opinion scrutinizes the facts attending whether plaintiff made a full release of its claims.  It cannot be gainsaid, however, that plaintiff, through Mr. Singh, failed to prove that it suffered damages as a result of the alleged breach.

On December 24, 1991, the Huntsville (Alabama) Division of the Army Corps of Engineers (the "Corps") awarded plaintiff, as subcontractor to the U.S. Small Business Administration (the "SBA"), Contract No. DACA87-92-C-0004 ("Contract 0004") to conduct facility contamination investigations and remedial designs at the Watervliet Arsenal ("Watervliet") in New York.  Through its president, Mr. Singh, plaintiff had been accepted

---

1/  The facts set forth in the "Facts" and "Discussion" sections of this opinion constitute the court's findings of fact pursuant to RCFC 52(a)(1), (c).  Rulings on mixed questions of fact and law are set forth in the "Discussion" section.  Those facts pertinent to the background of this case, but that are not relevant to the issues resolved by the trial, are set forth in detail in IMS Engineers-Architects, 87 Fed. Cl. at 542-50.

in the SBA 8(a) program since 1986 or 1987, 2/ and plaintiff received Contract 0004 as a result of this program.

Contract 0004 was a fixed-price contract for $859,663.00.  Mr. Singh early on had proposed an expanded scope of work that was implemented by subsequent modification on June 30, 1992, increasing the contract value to $1,383,916.00.  By further modifications the final value of the contract was set at $1,406,320.00.  The contract completion date was June 20, 1996.  A key deliverable under Contract 0004 was plaintiff's draft final work plan, which plaintiff submitted by July 9, 1992, recommending more tasks than originally were contracted.  See PX 43.  The work covered two areas known as Building 25 and Siberia, a storage area.  The Corps never approved plaintiff's work plan, and subsequent correspondence dated March 30, 1993, and June 3, 1994, from New York State and the Huntsville Division, respectively, commented on the work plan's deficiencies.  See id. (noting that a June 3, 1994 letter from the Huntsville Division was "the last correspondence on contract tasks completed by IMS").

Although its work plan was not approved, plaintiff proceeded to work at Watervliet. See Tr. at 378-79, 381 (Singh) (discussing plaintiff's submittal of a work plan and its work at Watervliet).  Because the Corps had not approved plaintiff's work plan, Mr. Singh acknowledged that plaintiff could not bill the Corps for that work.  See id.  Although Mr.

---

2/ The SBA's 8(a) program was established by an amendment to the Small Business Act, 15 U.S.C. §§ 631-57 (2006), on October 24, 1978.  See Act of Oct. 24, 1978, Pub. L. No. 95-507, § 202, 92 Stat. 1757, 1761 (codified as amended at 15 U.S.C. § 637).  In an effort to "maintain and strengthen the overall economy of the Nation," the Small Business Act assists eligible small business concerns by "insur[ing] that a fair proportion of the total purchases and contracts or subcontracts for property and services for the Government" are completed by small businesses.  15 U.S.C. § 631(a).  Under section 8(a) a small business concern is one "owned and controlled by socially and economically disadvantaged individuals," and which has participated in the small business and capital ownership development program. 15 U.S.C. § 637(a)(1)(C).  The statute defines socially disadvantaged individuals as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." 15 U.S.C. § 637(a)(5).

Although Mr. Singh viewed his course of dealings with the Corps as animated by ethnic or religious animosity, plaintiff's counsel did not try the case on either theory, and the record is bereft of anything other than Mr. Singh's several allusions, which even he did not press.

Singh understood that plaintiff "had to wait for [the Corps's] approval before [it] could continue with the work," Tr. at 379 (Singh), he considered that plaintiff's continued work was necessary in order to maintain a state of readiness and took the position that it was performed pursuant to the Corps's implicit approval, see Tr. at 380, 382-83, 385-86 (Singh). Nonetheless, Mr. Singh appreciated the corollary to plaintiff's continued work: that plaintiff was proceeding at its own risk. See Tr. at 381-82, 386 (Singh).

The Corps did not administer Contract 0004 within the spirit of the 8(a) program, particularly following a September 1994 reassignment of the contract's administration from the Huntsville Division to the Corps's Baltimore District. Plaintiff's subsequent interaction with the Corps and the SBA involved the following witnesses: COL Randall R. Inouye, who from 1994 to 1997 was the Commander of the Baltimore District; LTC Ralph H. Graves, the Deputy District Engineer for the Baltimore District from 1992 through June 1995; Contracting Officer Mary C. ("Cathey") Robertson of the Baltimore District, who was contracting officer when Contract 0004 was transferred to the Baltimore District during fall 1994; William Charles Ryals, Chief of the Corps Architect-Engineers ("AE") Contracting Branch from 1990 to 2001, who took over Contract 0004 from Ms. Robertson and became Terminating Contracting Officer during late January 1996; Christina E. Correale, Chief of the Baltimore District's Hazardous, Toxic, and Radioactive Waste Design Center from late 1991 through March 1998; Patricia A. Huber, the Corps Deputy for Small Business from 1991 through 1997; James O. Branch, a contracting officer and business development specialist from 1991 through 1997 with the SBA's Region II out of Buffalo, New York; and James R. Sherman, an Environmental Protection Specialist who worked for Watervliet from 1992 to 1997.

In conjunction with the reassignment of Contract 0004 to the Baltimore District, the Corps arranged a concomitant absorption of the work by a large government contractor, Malcolm Pirnie Inc. ("MP"), that had been performing facility investigations to locate contamination at Watervliet. As of August 8, 1994, the Army's director of Public Works at Watervliet had requested that the Huntsville Division terminate plaintiff's contract. PX 46, at 106. On August 10, 1994, Mr. Singh met with LTC Graves to discuss plaintiff's qualifications and to communicate plaintiff's interest in continued work on Contract 0004. In an August 11, 1994 letter to John Paris, Watervliet's Chief Environmental Engineer, Mr. Singh highlighted plaintiff's credentials, but when Mr. Sherman, on August 29, 1994, forwarded Mr. Singh's letter by facsimile transmission to the appropriate contracting officer at the Baltimore District, he commented that "[o]ur position is that [MP] is our contractor and Baltimore is our executor." PX 11; see also Tr. at 527-28 (Sherman) ("[W]e were not the contracting office . . . . [The Baltimore District] should . . . be in receipt of this letter, not us.").

The Corps transferred Contract 0004 from the Huntsville Division to the Baltimore District on September 13, 1994, with the contract files officially transferred on September 30, 1994.  PX 46, at 106.  Before Contract 0004 was terminated in 1996—indeed, during 1994—MP began completing the work under plaintiff's contract.  Although Mr. Sherman demonstrated minimal recall, he confirmed that MP performed the work that plaintiff originally contracted for under Contract 0004.  See Tr. at 540.

Mr. Branch was an enthusiastic advocate for the SBA's mission to foster opportunities for small businesses to grow and for the firms enrolled in the SBA's 8(a) program.  He testified that "we were violently opposed to what was going on," Tr. at 494, concerning the proposed transfer of work and termination.  The SBA Buffalo District had not been advised of any deficiencies with plaintiff's performance, see id., and it was Mr. Branch's expectation that the contract work would have been kept within the SBA program and not given to a large business.  In a letter dated August 11, 1994, Mr. Branch had communicated the SBA's expectations to the Corps, copying COL Inouye, as follows:

> Our participant firm, IMS, has been performing in a satisfactory manner on assignments issued under this contract at the Watervliet Arsenal in New York.  We understand from our client, IMS, P.C. that the Huntsville [Division] Corps may not be conducting any Hazardous, Toxic and Radioactive Waste (HTRW) work and that existing contracts are proposed to be transferred to the Baltimore District.
>
> We will appreciate you transferring this contract to [the] Baltimore Corps District and also advis[ing] [the] SBA.  We request that the SBA's total contract of $1,536,616 with you be transferred to Baltimore District.  This will allow IMS to complete the task which they are presently conducting for your client, the other tasks included in this contract and any additional delivery orders which Baltimore Corps District might want to assign to our client.
>
> We have already requested Baltimore Corps District to accept this Contract and allow our client to perform this work and any additional task orders under this contract.  IMS has been capably performing under an existing contract with Baltimore Corps District and has received a very favorable evaluation for a project completed by them recently.  Their contracting and technical people are familiar with the firm's expertise.

PX 7; see also PX 8 (August 11, 1994 letter from Elizabeth J. Perno, SBA Region II Assistant District Director, Minority Enterprise Development, to COL Inouye, stating "[w]e anticipate additional task orders will continue to be offered to [IMS] under [Contract

0004]"). LTC Graves wrote a note (undated) to COL Inouye in response to Mr. Branch's letter and commented:

> I have talked to you about this one. Despite [the August 11, 1994 SBA letter], we intend to switch to Malcolm Pirnie for the work [under Contract 0004] at Watervliet. We will try to soften the blow by arranging for IMS to be a sub to MP. We will inform SBA of our decision.

PX 9.

Corps personnel recognized that the Corps would struggle to justify the contract's termination, see PX 15 (September 1, 1994 e-mail from Contracting Officer Robertson to LTC Graves, stating that "they do not have a strong position to [terminate for default] nor can they support a [termination for convenience]"), and the Corps attempted to mollify plaintiff and the SBA by arranging for plaintiff to work as MP's subcontractor, see Tr. at 842-46 (Ryals); PX 14; PX 15. A note dated August 19, 1994, from Mr. Ryals to Greg Mathews of MP stated that it was "a go to use our recommended 8(a) sub[contractor] at Water[vliet] NY." PX 10. Subsequently, MP offered to pay plaintiff for approximately one-quarter of the work at Watervliet—work previously under Contract 0004—if plaintiff agreed to act as subcontractor. See PX 15. On August 31, 1994, before plaintiff responded to MP's offer, Mr. Branch wrote another letter to COL Inouye, reiterating the SBA's position:

> It is well documented on this contract [Contract 0004] and numerous others that IMS[] performs in a professional and satisfactory manner, with no documented delays. IMS, P.C. has our full support. This office is not aware of any information that would justify the termination of this contract.

> The major concern here is the proposal to terminate IMS and assign the remainder of the work on this project to a large business [MP]. The two alarming issues are: That the U.S. Army Corps of Engineers, or any agency would take such measures, to the detriment of a small business, without sound justification, and, assign the work to the task order of a large business concern without competition.

> This proposal appears to contradict many federal acquisition guidelines. We are requesting that IMS be permitted to complete this project under the terms and condition[s] of the existing contract [Contract 0004].

PX 13.

On September 2, 1994, plaintiff rejected MP's offer to act as a subcontractor. A September 12, 1994 letter from COL Inouye to Ms. Perno of the SBA explains the Corps's position on why Contract 0004 was transferred from plaintiff to MP:

> [W]e and the installation have largely revised the workplan submitted by IMS and negotiated approval from regulators. This revised plan will be substantially less expensive than the one proposed by IMS. We shall award a delivery order for the investigation described in the revised workplan to Malcolm-Pirnie (a competitively awarded contract through our A-E selection procedures) with expiring money before the end of September. To modify the IMS contract to perform the revised workplan would take several months, placing the installation in violation of its consent agreement and risking large fines.
>
> . . . We encouraged Malcolm-Pirnie to offer a subcontract to IMS, but apparently IMS did not consider the opportunity favorably. We are always interested in doing business with qualified 8(a) firms, and therefore you will soon receive an offering letter recommending IMS as a candidate for an indefinite-delivery contract with the Baltimore District for environmental work in the New York area.
>
> . . . We look forward to doing other work with you and with IMS in the coming year.

PX 17. But see PX 46 (stating, in relation to MP's contract, that "[t]he scope[] of work [is] essentially the same as the IMS contract scope of work"). The Corps continued to explore the termination of Contract 0004. See PX 19 (September 20, 1994 e-mail from Ms. Robertson to COL Inouye, LTC Graves, and Mr. Ryals, among others, stating that "[a]fter FY94 year-end, we need to discuss what/how we are going to [terminate for convenience] this contract").

Plaintiff introduced documents from the Corps's internal correspondence as evidence that the Corps unjustifiably refused to work with plaintiff. For example, an August 31, 1994 e-mail from Ms. Robertson relates the SBA's concern regarding the Corps's plan to take work away from plaintiff:

> Penny Cincibus, Assistant to Pat Huber . . . , received a call from Jim Branch, who is the [contracting officer] with SBA on the IMS contract on 29 Aug. He is very upset and "appears" to be leaning towards making lots of trouble for us if we do not take the IMS contract. He indicated nobody has

7

convinced him as yet, why[] IMS should not be given this work.  He is also very upset that we would go to a LARGE BUSINESS contractor in lieu of the awarded 8(a) for the work. . . . I also told him this was not a contracting decision and made at levels above us. . . .

      . . . .

      My position on this is to try and convince SBA that we are trying to avoid any economic problems for IMS which is the reason we have Malcolm trying to negotiate with them on doing this work.  So far, SBA has not been convinced on this issue.

PX 14; see also PX 12 (Ms. Robertson's August 31, 1994 notes, stating "Per LTC [Graves] - we will march forward w/ [MP] - [Huntsville Division] has the problem w/ IMS").  A September 1, 1994 e-mail from Ms. Robertson captioned "The Continuing Saga of IMS vs Malcolm" summarizes the situation:

      WHAT A MESS!!  Jerry spoke with Mr. Jim Reynolds yesterday.  He is the Director of Contracting for HND [Huntsville Division].  Mr. Reynolds indicted they do not have a strong position to [terminate for default] nor can they support a [termination for convenience] since the requirement for the work at WVA [Watervliet] is still necessary.  However, Mr. Reynolds indicated they would not transfer the contract to BDO [Baltimore District] if we did not want it.  Mr. Biggs, Sherry Higgins, HND Office of Counsel, and Mr. Reynolds are meeting on this issue this afternoon. . . .

      . . . In the meantime, the clock ticks . . . .

PX 15 (final ellipsis in original).

      Notwithstanding the Corps's impulse to terminate, the parties collaborated to delay the contract's termination.  Although the Corps identified new work unrelated to Contract 0004 to award to plaintiff and, correlatively, to appease Mr. Singh, see Tr. at 848-49 (Ryals) (discussing PX 20, a Corps memorandum dated September 26, 1994, identifying possible work for plaintiff), Mr. Singh continued to lobby for work under Contract 0004.  On a November 18, 1994 handwritten note attached to and forwarded with a November 17, 1994 inquiry from Mr. Singh, LTC Graves informed COL Inouye:

      As you remember, [Contract 0004] has been superceded by an award we made to Malcolm-Pirnie [sic] for the work at Watervliet.  We intend to [t]erminate

IMS, but haven't done so yet.  We are working with [the] SBA to give IMS a new 1.5M IDTC [indefinite-delivery-type contract].  I guess Singh is coming in to argue again for the Watervliet contract.  He doesn't convince me, and now it's [overcome by events].

PX 23.

At Mr. Singh's behest, the Corps postponed its termination of Contract 0004.  See PX 35 ("[H]e doesn't want [a termination for convenience.]"); see also Tr. at 847 (Ryals) ("[W]e were going through a lot of effort to try to see what we could do to keep . . . IMS operating there, make utilization of them at Watervliet and also get our project completed and avoid penalties.").  A November 22, 1994 e-mail from LTC Graves summarized a meeting during which Mr. Singh declined a termination for convenience or partial deletion of work, but evinced a preference for an out-of-scope modification that would allow plaintiff to work elsewhere.  See PX 25.  In a December 8, 1994 letter to LTC Graves, Mr. Singh petitioned for a "resolution of [Contract 0004] that is agreeable to all the parties involved, in the near future."  PX 33.  Handwritten notes from LTC Graves dated December 13, 1994, and December 16, 1994, respectively, acknowledge Mr. Singh's desire to resolve the matter regarding Contract 0004 without resort to a termination for convenience and record LTC Graves's recommendation to provide plaintiff with an out-of-scope modification or a new contract for work.  3/  PX 34; PX 35.

On March 3, 1996, the Corps first instructed plaintiff to stop work on the contract.  See Tr. at 834-35 (Ryals).  But see PX 50 (indicating that the Corps issued the stop-work order on March 1, 1996).  On March 25, 1996, Contracting Officer Ryals wrote the SBA that Contract 0004 would be terminated for convenience and requested that plaintiff provide a settlement proposal.  See PX 50.  Prior to this notification, however, the Corps seems to have recognized—in unattributed, anecdotal records—its irregular administration of Contract 0004.  One document, a series of questions and answers maintained in the Corps's contract file, detailed, as follows:

7. Why do we have to pay IMS a lot of money when they weren't performing?

Ans: We have no documentation to prove that IMS was not performing.  Without such proof, it is assumed that they were performing satisfactorily.  They have a valid contract for work that must be done.  We have arbitrarily

---

3/  The Corps never added additional work to plaintiff's Watervliet contract, but a new IDTC contract was issued in June 1995.  See Tr. at 852, 855-56 (Ryals).

awarded the same work to another A-E.  Thus we have deprived IMS from performing the work and earning the fee that [it] was contracted to do.  (I believe that's illegal, but I'll defer to counsel.  SPP) Furthermore, Mr. Singh knows that we have awarded the work to another contractor.  He's in a very strong negotiating position. . . . If he argues that he has [been] unjustly deprived of all the work, he has a case to collect the remaining $1,000,000 on the contract and possibly damages as well.

> 8.  What will a termination for convenience be based on?

> [Ans:] User Request. [4/]

PX 45.  Further, in a bullet-point summary dated March 1, 1996, and maintained in the Corps's contract file, an unidentified author listed the following:

- Insufficient documentation to support Termination for Default
- Termination for Convenience of the Government is the only viable option
- IMS, P.C. must be compensated
- IMS, P.C. could claim the remainder on the contract ($1M) plus damages
- Recommend that the District resolve the termination as expeditiously as possible

PX 48.

The Corps first moved to terminate plaintiff's contract with a March 25, 1996 notice to the SBA.  See PX 50.  On June 21, 1996, plaintiff submitted a settlement proposal and claimed—through subsequent amendment—a total amount due of $824,982.52.  See PX 51, at 128.  But see PX 62, at 242 (stating, in its Request for Equitable Adjustment ("REA") filed on June 21, 2000, that plaintiff had prepared a proposal in the amount of $824,587.00).  Plaintiff's $824,982.52 claim included costs grouped into the following categories: preparation of the settlement proposal ($21,236.07); continuance of on-site staff ($118,807.26); salary escalation ($42,587.21); interest charges ($179,636.85); and work at two sites at Watervliet, Building 25 ($36,573.26) and Siberia ($426,141.87).  See id.

---

4/  Question-and-answer #8 is handwritten, but the preceding seven entries are typed. Mr. Ryals testified that he wrote question-and-answer #8, and he agreed that he would have reviewed question-and-answer #7, which is unattributed.  Tr. at 866.

Initially, the parties could not agree on a settlement for the termination of plaintiff's work. An audit performed by the Defense Contracting Audit Agency (the "DCAA") questioned the costs claimed by plaintiff, as plaintiff "was unable to provide supporting labor hours, materials and supplies and other direct costs for [the] termination proposal." 5/ PX 69; see also Tr. at 1083 (Ryals) ("[W]hen the audit came back they [sic] said that there wasn't any information that we could rely on to evaluate . . . ."). Plaintiff had lost its accounting information and did not back-up its records. See PX 69. Later, after the parties commenced their direct settlement negotiations in October 1996, Contracting Officer Ryals recorded in his October 3, 1996 notes that Mr. Singh "mentioned that his records were destroyed due to damage when he moved from one place to another." PX 53. A pre-negotiation cost-comparison prepared by the Corps's engineering division calculated $451,313.00 owing for plaintiff's work. See PX 69. This cost-comparison was not provided to plaintiff during the parties' settlement negotiations. Tr. at 872 (Ryals).

In October 1996 the parties held in-person settlement negotiations, during which the Corps continued to question plaintiff's claims. Plaintiff had lost its records and provided no documentation of its expenses. See PX 53; PX 69. Although plaintiff retained only three or four employees, Mr. Singh justified plaintiff's staffing expenses by claiming that plaintiff's employees wore "dual hats." See PX 54, at 191. Mr. Singh struggled to justify plaintiff's charges for financing its operations, charges that allegedly arose after the Corps prevented plaintiff from continuing performance on Contract 0004. Id. Additionally, plaintiff's claimed costs for work at Siberia were distributed across thirty-six tasks, twenty-one of which had not been performed. See PX 53, at 186 ("Task[s] 1-14 were completed or worked on but . . . items 15-36 were not even dug, drilled or surveyed."). At trial Mr. Singh disputed the Corps's assessment that plaintiff had not dug, drilled, or surveyed many of its claimed Siberia tasks and pointed out that plaintiff had performed some work, primarily in the form of preparatory field work. See Tr. at 377 (Singh). He acknowledged, however, that any preparatory field work was performed in the absence of an approved work plan. See Tr. at 379-81.

The Corps's records of the parties' settlement negotiations document the Corps's tough negotiating position. Contracting Officer Ryals and Contracting Specialist Jean Petty, negotiating for the Corps, disputed Mr. Singh's calculations of employee salaries and accumulated interest. Ms. Petty also indicated that any work that plaintiff performed without

---

5/ The DCAA auditors "questioned $1,055,736 in costs . . . ." PX 69. The DCAA likely evaluated both the $824,982.52 claimed by plaintiff and the $355,950.00 already paid to plaintiff, then questioned $1,055,736.00 of this amount. Cf. Tr. at 887 (Ryals) (discussing the amount previously paid to plaintiff).

first having received a notice to proceed or a Corps-approved work plan had been at plaintiff's risk.  See PX 53, at 188.  Mr. Singh reduced his settlement proposal from $824,982.52 to $720,000.00, see PX 55, at 194-96; still, when Mr. Singh protested the Corps's opening offer of $377,000.00, Mr. Ryals advised "that maybe it may be a good [idea] that . . . IMS got their [sic] attorneys involved," PX 53, at 188.  Mr. Ryals eschewed a unilateral settlement by determination or a partial payment because no documentation of plaintiff's costs was available. 6/  See Tr. at 882 (Ryals).  Mr. Ryals also declined Mr. Singh's requests to condition the settlement on increasing the value of plaintiff's other contracts with the Corps or on linking plaintiff's other two contracts.  See Tr. at 1093 ("I always tried to make it pretty straightforward that these are two separate contracts, that we're trying to just settle the [termination for convenience] here."); see also Tr. at 1095 (testifying that he made "[n]o guarantees, no promises [that plaintiff would receive additional work], but I did continue the efforts to try to find work to put into the other contract"); PX 54, at 191-92 (discussing same).

Ultimately, after Mr. Ryals reiterated to Mr. Singh that "without financial records, a settlement was very difficult," PX 54, at 192, Mr. Singh and the Corps agreed on October 30, 1996, to settle for $499,999.00, see Tr. at 1095 (Ryals). 7/  Mr. Ryals later recorded his conclusion that "[t]he settlement represents a fair and reasonable conclusion to this contract and all parties are satisfied with its outcome."  PX 55, at 196.  Having completed its work on Building 25, plaintiff received the entirety of its correlated claim ($36,573.26).  See id. at 190.  Plaintiff also received the entirety of its claim for salary escalation ($42,587.21).  Id.

---

6/  Responding to the court's inquiry regarding why he did not issue a partial settlement, Mr. Ryals explained:

> Well, virtually every contractor states [that it has lost money and is suffering financial hardship].  I mean, not to cast any aspersions, but everybody is always losing money.  There is no substantiation of that.  I thought that DCAA audit, okay, I got it, and every contractor has their difficulties in payment issues, but how am I going to justify that to the folks who are going to open this up later on to audit it and say why did you spend that money when there is no justification for the expense there.  That's why we settled it at the number that we did.

Tr. at 1110.

7/  Plaintiff received a total of approximately $855,000.00, including the amount already paid to plaintiff for contract performance and the $499,999.00 settlement.  See Tr. at 887 (Ryals).

Almost all of plaintiff's claim for preparation costs was awarded ($20,000.00, against the claimed $21,236.07).  Id.  Plaintiff did not receive the full amount that it had claimed for categories for which the Corps found inadequate justification: for the continuance of on-site staff, plaintiff received $60,000.00 (rather than $118,807.26); for interest charges, plaintiff received nothing (rather than $179,636.85); and, for Siberia, plaintiff received $340,838.79 (rather than $426,141.87).  Id.; see also PX 50 (stating total interest charges originally claimed by plaintiff).  Insofar as the Corps discounted plaintiff's claim for work at Siberia, Mr. Ryals recorded:

> The contractor never got his work plan formally approved by the Government. . . . [IMS] proceeded with preparing for the field work (according to Mr. Singh) even though the work plan had not been formally approved.  The contracting officer considered payment of half of the value of the activity to reach an equitable accord.

PX 54, at 191.

Plaintiff received the aggregate $499,999.00 after Mr. Singh signed a release of claims on December 23, 1996.  The release recited, in pertinent part:

> The work under Contract Number DACA87-92-C0004, dated December 24, 1991 between the United States of America, represented by William C. Ryals Contracting Officer, and the undersigned contractor, having been completed and finally accepted, the United States, its officers and agents, are hereby released from all claims and demands whatsoever arising under or by virtue of said contract, except as follows: (If none, so state.) None[.]

PX 57.  Defendant contends that this release waived any claim relating to Contract 0004.

During 1994 when plaintiff lost the work under Contract 0004, the Corps endeavored to find other work for IMS to perform.  LTC Graves initially sought an out-of-scope modification that would satisfy the 8(a) program and would be within plaintiff's capabilities, but he subsequently identified a new indefinite-delivery, indefinite-quantity contract as the best means to assist plaintiff.  See Tr. at 1072-73 (Graves).  Plaintiff had been awarded Contract No. DACA31-92-0046 ("Contract 0046") on September 30, 1992.  Contract 0046 had a minimum obligation of $100,000.00 and a maximum contract amount of $3 million.  Between 1992 and 1994, the Corps's task orders under Contract 0046 exceeded the contract minimum.  After the work under Contract 0004 was transferred, plaintiff had been awarded Contract No. DACA31-95-D-0057 ("Contract 0057") on June 30, 1995.  Contract 0057 had a minimum obligation of $15,000.00 and a maximum contract amount of $750,000.00.  By

the expiration of Contract 0057 in June 1997, the Corps's delivery orders had exceeded the contract minimum.  Both LTC Graves and Mr. Ryals were aware that plaintiff's work had been switched over to MP in 1994.  However, Corps officials did not assist plaintiff in obtaining work that would compensate plaintiff *pro tanto* for plaintiff's claimed losses.  Rather, the Corps explored several options to give plaintiff suitable work, and, while LTC Graves may have indicated to the SBA the potential for an indefinite-delivery contract with a maximum value of $1.5 million, Contract 0046 and Contract 0057 themselves did not contemplate orders beyond a stated minimum, which was achieved in each case.

Plaintiff initiated its claim by submitting the REA on June 21, 2000.  PX 62.  The Corps denied the REA and plaintiff's agency appeal, which was filed July 23, 2001.  PX 63; PX 64; PX 65.  Plaintiff filed its complaint in the United States Court of Federal Claims on May 8, 2007, alleging that the Corps breached the duty of good faith and fair dealing involving Contract 0004, Contract 0046, and Contract 0057.  The court granted partial summary judgment in favor of defendant on plaintiff's claims regarding Contract 0046 and Contract 0057, IMS Engr's-Architects, 87 Fed. Cl. at 553, because those two contracts obligated the Corps only to minimum orders, leaving the validity of the release and plaintiff's claims involving Contract 0004 for trial.

## DISCUSSION

The Court of Federal Claims may "render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States," excluding actions sounding in tort.  28 U.S.C. § 1491(a)(1) (2006).  Plaintiff's claims satisfy the court's jurisdictional prerequisite in that plaintiff alleges that the Corps improperly diverted work under Contract 0004 and terminated plaintiff's contract—a breach of the implied duty of good faith and fair dealing.  See Precision Pine & Timber, Inc. v. United States, Nos. 2008-5092 & 2008-5093, 2010 WL 569733, at *10 (Fed. Cir. Feb. 19, 2010) ("Cases in which the government has been found to violate the implied duty of good faith and fair dealing typically involve some variation of the old bait-and-switch. . . . The government may be liable for damages when the subsequent government action is specifically designed to reappropriate the benefits the other party expected to obtain from the transaction . . . .") (citations omitted)).  Plaintiff must overcome the full release that it executed on December 23, 1996, by which plaintiff released the Corps from all claims arising under Contract 0004.

14

I.  Whether plaintiff should be bound to the release

    1.  Standard of review

       Federal law guides the court's consideration of the December 23, 1996 release.  See Dureiko v. United States, 209 F.3d 1345, 1356 (Fed. Cir. 2000); see also Kenbridge Constr. Co. v. United States, 28 Fed. Cl. 762, 765 (1993) ("The release is a contractual provision, and its interpretation is a matter of law.").  As a general rule, after executing a release, a contractor "is thereafter barred from maintaining a suit for damages or for additional compensation under the contract based upon events that occurred prior to the execution of the release."  B.D. Click Co. v. United States, 614 F.2d 748, 756 (Ct. Cl. 1980) (citations omitted).  When a contractor fails to reserve specific claims as exceptions to a release, "it is neither improper nor unfair to invoke the principle that, absent some vitiating circumstance, the contractor 'cannot thereafter successfully maintain a suit . . . based upon events which occurred prior to the execution of the release.'"  Inland Empire Builders, Inc. v. United States, 424 F.2d 1370, 1376 (Ct. Cl. 1970) (citation omitted) (alteration in original).

       Releases are interpreted "in the same manner as any other contract term or provision." Bell BCI Co. v. United States, 570 F.3d 1337, 1341 (Fed. Cir. 2009).  The court first must ascertain "whether [the release's] language clearly bars the asserted claim."  Dureiko, 209 F.3d at 1356 (citing King v. Dep't of the Navy, 130 F.3d 1031, 1033 (Fed. Cir. 1997)).  Clear and unambiguous terms receive their ordinary meaning.  McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996); Ala. Lumber & Pulp Co. v. Madigan, 2 F.3d 389, 392 (Fed. Cir. 1993).  Exceptions explicitly reserved by the release are strictly construed in favor of the Government.  Id.  When confronted with ambiguous release language, the court must "construe [the release's] language to effect the parties' intent at the time they executed the release."  Dureiko, 209 F.3d at 1356 (citing King, 130 F.3d at 1033).

       "Special and limited circumstances" will vitiate an executed, otherwise effective release.  Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1395 (Fed. Cir. 1987). These circumstances include "economic duress, fraud, or mutual mistake."  Id. (citing J.G. Watts Constr. Co. v. United States, 161 Ct. Cl. 801, 806-07 (1963)).  Further, "where the conduct of the parties in continuing to consider a claim after the execution of the release makes it plain that they never construed the release as constituting an abandonment of the claim, . . . the release will not be held to bar the prosecution of the claim."  J.G. Watts, 161 Ct. Cl. at 807 (citing Winn-Senter Constr. Co. v. United States, 110 Ct. Cl. 34, 65-66 (1948)).

2.  The validity of the release

The court must consider the effect of two releases that were agreed upon by the parties.  Effective November 14, 1996, the parties agreed to the following (the "superceded release"):

> The work under Contract Number DACA87-92-C-0004, dated 24 December 91, between the United States of America, represented by William C. Ryals[,] Contracting Officer, and the undersigned Igbal [sic] Singh, P.E. President AAEE, IMS, P.C. Environmental & Engineering, having been Terminated for the Convience [sic] of the Government, the United States, its officers and agents, are hereby released from all claims and demands whatsoever arising under or by virtue of said contract.

PX 56, at 198.  The superceded release's language incorrectly spells Mr. Singh's name and inaccurately recites plaintiff's legal name.  Tr. at 205 (Singh) (testifying that neither "Environmental & Engineering," nor "AAEE [the American Academy of Environmental Engineers]," is the name of IMS Engineers-Architects, P.C.).

The December 23, 1996 release—described by Mr. Ryals as the "standard government release of claims," Tr. at 889—corrects the superceded release's misspelling of Mr. Singh's name, see PX 57, at 200.  The December 23, 1996 release stipulates, as follows:

> The work under Contract Number DACA87-92-C-0004, dated December 24, 1991, between the United States of America, represented by William C. Ryals[,] Contracting Officer, and the undersigned contractor, having been completed and finally accepted, the United States, its officers and agents, are hereby released from all claims and demands whatsoever arising under or by virtue of said contract, except as follows: (If none, so state) None[.]

PX 57, at 200.  Although the December 23, 1996 release similarly lists plaintiff's name as "IMS, P.C., Environmental & Engineering," Mr. Singh signed the release with the official title of "President" and certified:

> I, Iqbal Singh, certify that I am the President of the Corporation executing this release [IMS, P.C., Environmental & Engineering]; that Iqbal Singh who signed this release on behalf of the Contractor was then President of said Corporation; that said release was duly signed for and on behalf of said

16

Corporation by authority of its governing body, and is within the scope of its corporate powers.

Id.

The December 23, 1996 release bars plaintiff's claims.  Plaintiff's claims pre-date the December 23, 1996 release and arise under Contract 0004, but the release did not expressly reserve them.  See B.D. Click Co., 614 F.2d at 756; Inland Empire Builders, 424 F.2d at 1376.  At the time that he executed the release, Mr. Singh knew the pertinent facts: that MP (not plaintiff) would complete the work at Watervliet and that plaintiff correspondingly was aggrieved.  See Tr. at 425 (Singh); see also PX 11 (Mr. Singh's August 11, 1994 letter to Mr. Paris); PX 17 (COL Inouye's September 12, 1994 letter to Ms. Perno, stating "Mr. Singh of IMS visited the [Baltimore] District"); PX 23 (Mr. Singh's November 17, 1994 letter to COL Inouye); PX 25 (LTC Graves's November 22, 1994 e-mail documenting a meeting with Mr. Singh); PX 29 (Ms. Robertson's November 23, 1994 notes recording that "Mr. Singh not satisfied w/ what he heard from us - not get[ing] everything he wants"); PX 30 (November 28, 1994 letter from Mr. Singh to Ms. Robertson); PX 31 (COL Inouye's undated letter to Mr. Singh, stating "[a]s explained to you . . . the Watervliet work has been given to another contractor"); PX 33 (Mr. Singh's December 8, 1994 letter to LTC Graves, stating "[y]ou stated that your District had decided that the work under our Contract will be performed by Malcolm Pirnie"); PX 38 (Ms. Robertson's February 13, 1995 e-mail indicating that Mr. Singh had complained to his congresswoman); PX 39 (February 13, 1995 e-mail from Ms. Correale, stating, "Mr. Singh went to BG Stevens [Headquarters, Corps] about his treatment by the Corps").  Aside from manifestations of the Corps's misgivings with and embarrassment concerning its handling of Contract 0004 and its recognition that a termination for convenience would be difficult to justify, the evidence does not show that after 1996 plaintiff discovered anything more about the existence of a cause of action than what already was apparent to and known by Mr. Singh prior to the parties' settlement negotiations and the December 23, 1996 release.

Any ambiguity created by the incorrect recitation of plaintiff's legal name is dispelled by both Mr. Singh's self-certification as "the President of the Corporation executing this release" and the release's specific reference to "Contract Number DACA87-92-C-0004." 8/ See PX 57, at 200.  The declaration that plaintiff's work under Contract 0004 had been "completed and finally accepted," id., reconciles with the following language of the

_____

8/ Other documents from the parties' records refer to plaintiff as "IMS, P.C."  See PX 13 (August 31, 1994 letter from Mr. Branch to COL Inouye); PX 48 (March 1, 1996 notes in Corps's contract file).

superceded release: "Upon final payment [of the settlement to plaintiff], the contract will be considered by both parties to be complete," PX 56, at 198. In return for executing the December 23, 1996 release, plaintiff received the parties' agreed-upon settlement amount of $499,999.00. See Tr. at 210-11 (Singh) ("[Mr. Ryals] said in order to release the money we had to sign [the December 23, 1996 release]."); see also PX 56, at 198 (declaring amount due to be $499,999.00). Accordingly, upon the Corps's payment of the $499,999.00 settlement, the Corps considered plaintiff's work to be complete and accepted and plaintiff's claims to be released.

### (1)  Economic duress does not obviate the release

Economic duress does not vitiate the December 23, 1996 release. A plaintiff claiming economic duress "'must establish that (1) it involuntarily accepted [the other party's] terms, (2) circumstances permitted no other alternative, and (3) such circumstances were the result [of the other party's] coercive acts.'" Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1329 (Fed. Cir. 2003) (alterations in original) (quoting Dureiko, 209 F.3d at 1358). The plaintiff's showing of coercion must reveal that "the government's action was wrongful—*i.e.*, that it was (1) illegal, (2) a breach of an express provision of the contract without a good-faith belief that the action was permissible under the contract, or (3) a breach of the implied covenant of good faith and fair dealing." Id. at 1330 (citing Sys. Tech. Assocs., Inc. v. United States, 699 F.2d 1383, 1387-88 (Fed. Cir. 1983)).

Absent wrongful conduct, economic pressure and the threat of considerable financial loss do not constitute duress. Id. (quoting Johnson, Drake & Piper, Inc. v. United States, 531 F.2d 1037, 1042 (Ct. Cl. 1976)); see also David Nassif Assocs. v. United States, 644 F.2d 4, 12 (Ct. Cl. 1981) ("To render an agreement voidable on grounds of duress it must be shown that the party's manifestation of assent was induced by an improper threat which left the recipient no reasonable alternative save to agree. . . . [This includes] threats which, though lawful in themselves, are enhanced in their effectiveness in inducing assent to unfair terms because they exploit prior unfair dealing on the part of the party making the threat." (citations omitted)); Aircraft Assocs. & Mfg. Co. v. United States, 357 F.2d 373, 378 (Ct. Cl. 1966) ("Economic duress may not be implied merely from the making of a hard bargain. . . . Therefore, if the Government's wrongful actions had not caused or contributed to plaintiff's financial difficulties, the exaction of a release from plaintiff under a threat to exercise the Government's contractual right would not vitiate the release on the ground of duress."); Fruhauf Sw. Garment Co. v. United States, 111 F. Supp. 945, 951 (Ct. Cl. 1953) ("The assertion of duress must . . . have been the result of the defendant's conduct and not by the plaintiff's necessities.").

The Corps's contract administration was irregular, and the Corps officials knew that was the case. However, the credible testimony of the Corps's fact witnesses overcomes Mr. Singh's charge of economic duress. As was revealed at trial, plaintiff's evidence of financial distress was weak. Letters from Mr. Singh dated November 28, 1994, and December 8, 1994, amount to no more than unsubstantiated pleas for relief. See PX 30 (stating, in November 28, 1994 letter, that "we might be suffering a life time loss"); PX 33 (recalling, in December 8, 1994 letter, earlier statements that "IMS will suffer a grave financial loss"). The Corps understood that the transfer of Contract 0004 from plaintiff would occasion a loss of work. 9/  See PX 31 (reassuring plaintiff, in an undated letter, that the Corps "is pursuing other avenues of work to assist your firm in recovering from this loss of work"); PX 59, at 206 (listing, in a chronology entry dated February 28, 1996, that Mr. Singh notified the Corps "of his critical situation and that he is losing +$700,000 of his own money due to inactivity of contract and he is losing his business"). Nevertheless, plaintiff never has been able to document its claimed losses.

To plaintiff's ultimate detriment, Mr. Singh's testimony lacked credibility and logic, and his equivocal explanation of plaintiff's financial losses obfuscated the issue and illuminated the Corps's predicament in attempting to make sense of his claims. At a November 23, 1994 meeting with LTC Graves, Mr. Singh complained that he had financed $800,000.00 of work at Watervliet, and he argued that IMS required between $8 million and $10 million of work in order to recover its losses, see Tr. at 387-88 (Singh), an absurdly high estimate that never was substantiated. At trial Mr. Singh claimed that $800,000.00 was merely a "rough estimate," Tr. at 390, and he reduced his estimated losses to some figure between $600,000.00 to $800,000.00, see Tr. at 393 ("Well, when I'm looking at the actual numbers which are there, at that time I'm talking from the top of my head and it's in the neighborhood of $600,000 to $800,000. When you put it down and actually have the figures in front [of] you, it is $635,000."). Mr. Singh's estimate at trial of $600,000.00 to $800,000.00 of actual costs varied from his deposition testimony, in which he estimated that plaintiff spent $700,000.00 to $800,000.00. See Tr. at 392-93. He hedged that "[w]hen I'm giving these numbers in what's called a courtesy type of meeting [with LTC Graves], you know, the figures which come to your mind are not necessarily the accurate figures." Tr. at 394; see also Tr. at 397 ("I did not have the exact costs . . . you know, it is a feeling.").

---

9/  In a February 13, 1995 e-mail, Ms. Robertson discussed the Corps's plans for allocating additional work to plaintiff and concluded that "[t]his is just a heads up that this company is still alive and trying to do well." PX 38. The court cannot infer coercion from this equivocal statement, and Ms. Robertson could not recall the e-mail's circumstances or her intent in using this language. See Tr. at 602-03.

Plaintiff's final accounting to the Corps is similarly unreliable. It appears that plaintiff settled on a figure of $635,867.03, which plaintiff's June 21, 1996 settlement proposal claimed was spent to finance work at Siberia. See PX 51, at 169. Of the $635,867.03, an unpaid balance of $426,141.87 allegedly remained, constituting one part of plaintiff's $824,982.52 settlement proposal dated June 21, 1996. 10/  See PX 51, at 128. That settlement proposal later became the basis for plaintiff's June 21, 2000 REA and its certified claim filed in 2001. See Tr. at 398-401 (Singh). As discussed, however, plaintiff provided no documentary support of plaintiff's alleged losses to the Corps, and, without these records, the DCAA concluded that approximately 90% of plaintiff's claimed expenditures were unverifiable. See supra note 5. On cross-examination Mr. Singh again conceded that plaintiff could not document any of its claimed costs for the Siberia-related work, see Tr. at 368-72, 402, and suggested that these claims were simply "estimate[s]," Tr. at 371. 11/

Plaintiff now contends that the remaining work under Contract 0004 would cost approximately $271,010.06, then claims $328,334.94 of lost profits and overhead. See Pl.'s Br. filed Nov. 13, 2009, at 56. Were the court to indulge the accuracy of Mr. Singh's sworn testimony—that plaintiff spent approximately $700,000.00 on Contract 0004, the median of Mr. Singh's $600,000.00 to $800,000.00 estimate, see Tr. at 393 (Singh), and a number consistent with Mr. Singh's deposition testimony, see Tr. at 392-93 (Singh)—then plaintiff's actual lost profits would be approximately $80,000.00, which the court calculates by reducing the total contract price ($1,406,320.00) by the $700,000.00 allegedly spent by plaintiff, the $271,010.06 of work allegedly remaining, and the $355,950.00 previously paid for plaintiff's completed work, see Tr. at 401-11.

To the extent that plaintiff suffered financial hardship or distress, testimony and documentary evidence mitigate the Corps's culpability for such circumstances and demonstrate that the Corps did not exploit plaintiff's condition to obtain the release. Plaintiff compounded its predicament: plaintiff originally declined a termination for convenience, then

---

10/ Plaintiff's initial settlement proposal did not allege financial distress or hardship. See generally PX 51.

11/ Plaintiff's failure to provide adequate documentation of its costs is explored further in this opinion's discussion of defendant's motion pursuant to RCFC 52(c) on plaintiff's claim for financing charges. See infra, Section II. As discussed in connection with the grant of judgment on partial findings, to the extent that plaintiff has failed to offer sufficient documentary evidence that Mr. Singh lost his own money, the court finds Mr. Singh's testimony to be tantamount to a plea for assistance, not credible evidence that he advanced any specific sum of money.

continued working on Contract 0004 without the requisite Corps-approved work plan. 12/
Nor, upon the commencement of settlement negotiations, was the Corps obligated to issue
a settlement by determination or a partial payment. 13/ The court finds no fault in Mr. Ryals,
who—absent   records   or   other   substantiation   to   justify   plaintiff's   settlement
proposal—believed that plaintiff later would contest a unilateral settlement decision and
preferred to obtain a mutually satisfactory settlement.  See Tr. at 1106-11 (Ryals) (explaining
his settlement rationale).   Although plaintiff's failure to justify its cost estimates and
settlement proposal explains Mr. Ryals's tough negotiating position, plaintiff nonetheless
obtained a result that cannot be characterized as unfair or exploitative: the final $499,999.00
settlement was approximately 33% higher than Mr. Ryals's opening offer of $377,000.00 and
over 10% higher than the Corps's cost comparison of $451,313.00.   The $499,999.00
settlement represented a negotiated payment by the Corps for work that had been approved
and completed at Watervliet, discounting plaintiff's undocumented cost estimates and
unapproved, incomplete work.   See Tr. at 1097-1102 (Ryals) (discussing a Corps
memorandum documenting the settlement of Contract 0004 (PX 55)).

Plaintiff's specific allegations of duress are unavailing.  See Pl.'s Br. filed Nov. 13,
2009, at 45-46.  Plaintiff suggests that Mr. Ryals unjustifiably adopted a "take it or leave it"
negotiating position, ignoring the mandate of the Federal Acquisition Regulation, which
provides: "If the contractor and TCO [terminating contracting officer] cannot agree on a
termination settlement, . . . the TCO shall issue a determination of the amount due consistent
with the termination clause, including any cost principles incorporated by reference." 48
C.F.R. ("FAR") § 49.109-7(a) (2010).  The court does not infer wrongful pressure or
coercion in the form of a "take it or leave it" position from Contracting Officer Ryals's
suggestion—when the Corps's settlement position was $377,000.00—that plaintiff consult
with an attorney.  Mr. Ryals's suggestion came at the conclusion of the first day of the
parties' negotiations, when he remained troubled by plaintiff's failure to document its cost
estimates, but continued to expect a successful settlement.  See Tr. at 1115 (Ryals).  The
parties had not reached an impasse, and Mr. Ryals was not obligated to issue a settlement by
determination pursuant to FAR 49.109-7(a).  Rather, Mr. Ryals reasonably believed that legal

---

12/  Even though the Corps waited until March 3, 1996, to issue a stop-work order,
Mr. Singh's recognition that plaintiff assumed the risk of performing unapproved work, see
Tr. at 382 (Singh), belies plaintiff's claim that it worked with the Corps's implicit approval.

13/  Plaintiff's counsel unconvincingly implied that Contracting Officer Ryals should
have issued a partial payment because such a payment would have approximated "a progress
payment under a termination for convenience regulation."  Tr. at 1114.  Plaintiff earlier had
declined a termination for convenience, and, without proof of plaintiff's costs, Mr. Ryals
reasonably decided to pursue a mutual, defensible settlement.  See Tr. at 1106-10 (Ryals).

counsel would aid plaintiff in obtaining a satisfactory settlement during the parties' subsequent anticipated negotiations.  See Tr. at 1115 (Ryals) ("I still had the idea that we would ultimately reach a settlement."); PX 53, at 188 (indicating the parties' expectation that negotiations would resume the following day); PX 54, at 191 ("It was clear that there would be no further progress that day, so both sides retired for the night." (emphasis added)).

Ultimately, plaintiff received a justifiable and fair settlement.  Plaintiff voluntarily agreed to the parties' settlement, and the evidence presented at trial did not reveal any coercion by the Corps.  The United States Court of Claims observed that "a telling indication that no duress was practiced is [a] long delay before plaintiff spoke out and claimed duress." Johnson, 531 F.2d at 1043; see also McLain Plumbing & Elec. Serv., Inc. v. United States, 30 Fed. Cl. 70, 83 (1993) ("[F]ourteen month delay in asserting coercion certainly detracts from the plaintiff's assertions of economic duress.").  Here, plaintiff first complained of duress in its June 21, 2000 REA, which was submitted approximately three-and-one-half years after the Corps allegedly coerced the parties' settlement and plaintiff's release.  See PX 62, at 242.  Plaintiff's delay in claiming duress gives credence to Mr. Ryals's testimony regarding the parties' good-faith negotiations and Mr. Singh's satisfaction with the $499,999.00 settlement.  See Tr. at 1102 (Ryals) (testifying that the Corps negotiated in good faith, and that, in his opinion, Mr. Singh's post-settlement attitude "was positive and it was good, [and] he seemed happy to be settling and getting this issue settled."); see also Tr. at 1103 (Ryals) ("I had no impression that [Mr. Singh] was under duress.  I assumed he had a choice.  He could either accept [the settlement] or not accept.").  But see PX 62, at 242-43 (stating, in plaintiff's June 21, 2000 REA, that plaintiff waited until 2000 to claim duress for fear of reprisal from the Corps).  Duress does not obviate the release.

The gravamen of plaintiff's claim of economic duress can be distilled from Mr. Ryals's testimony.  It was Mr. Ryals's opinion that,"[w]ell, virtually every contractor states [that it has lost money and is suffering financial hardship].  I mean, not to cast any aspersions, but everybody is always losing money.  There is no substantiation of that [here]. . . . That's why we settled it at the number we did." Tr. at 1110.  The Corps's administration and transfer of Contract 0004 may have resulted in financial loss, and these circumstances led to plaintiff's dissatisfaction with both the Corps and the parties' settlement.  Nevertheless, the court cannot disregard plaintiff's release on the basis that the Corps was aware that plaintiff had suffered a loss due to the transfer of work under Contract 0004 and the subsequent termination of Contract 0004.  The release was received by the Corps pursuant to the parties' settlement, which was negotiated at arms-length and was economically reasonable.  Plaintiff did not produce evidence to document its loss, to approximate a reasonable calculation of loss absent records, or to show that the Corps coerced a settlement that only partially compensated plaintiff for plaintiff's December 23, 1996 release.  See Sys. Tech Assocs., Inc., 699 F.2d at 1389 ("[Plaintiff] . . . does no more

than assert causation and the Government's coercive use of the circumstances to secure a settlement.  The record is totally devoid of proof of either count.").  After trial plaintiff's claim of economic duress remains unsubstantiated.

### (2)  <u>Wrongful conduct does not obviate the release</u>

Plaintiff argues that the release should be obviated because "[t]he file produced by the Government during discovery is replete with Government correspondence admitting that the Government breached the contract, and that it had no basis to terminate the contract for convenience."  Pl.'s Br. filed Nov. 13, 2009, at 48.  In essence, according to plaintiff, the release is tainted by the Corps's wrongful conduct that preceded the release and that was attributable to the administration and termination of Contract 0004.

Plaintiff's allegations of the Corps's wrongful conduct do not invalidate the December 23, 1996 release.  The evidence demonstrated that any such conduct did not procure, obtain, or otherwise taint the release.  Rather, it well preceded the December 23, 1996 release and was known by plaintiff prior to October 1996, when the parties entered into in-person settlement negotiations.  Although plaintiff asserts that "[h]ad IMS known what really occurred in regard to this contract, they [sic] never would have agreed to the termination," <u>id.</u> at 51, as hereinbefore discussed, plaintiff repeatedly had acknowledged, discussed, and received notice of the Corps's diversion of work to MP and de facto termination of the contract.

Such conduct does not attach to and invalidate plaintiff's release.  Plaintiff relinquished any such claims of wrongful conduct by the Corps by executing the release.  <u>See</u> <u>B.D. Click Co.</u>, 614 F.2d at 756; <u>Inland Empire Builders</u>, 424 F.2d at 1376.  Wrongful conduct not conjoined to the release is not a separately enumerated, special and limited circumstance justifying the obviation of a release.  <u>See</u> <u>Mingus</u>, 812 F.2d at 1395 (enumerating certain special and limited circumstances, absent unrelated wrongful conduct).  As suggested in <u>Rumsfeld</u>, wrongful conduct is indicative of coercion, which underlies a claim of duress, but it is not a stand-alone special and limited circumstance.  <u>See</u> <u>Rumsfeld</u>, 329 F.3d at 1330 ("<u>Government coercion</u> may be supported by a finding that the government engaged in wrongful acts . . . ." (emphasis added)).  In <u>Rumsfeld</u> the Government withheld payments from the plaintiff "simply to pressure the contractor into signing [a] modification," <u>id.</u> at 1331, thereby voiding the modification.  In contrast, plaintiff's allegations of wrongful conduct stem from the Corps's administration of Contract 0004, but cannot be attributed to the parties' arms-length settlement negotiations and the December 23, 1996 release.

(3)  Fraud does not obviate the release

Fraud is a "special and limited" circumstance that would allow the court to obviate the release.  See Mingus, 812 F.2d at 1395.  It occurs with "the making of a false representation, usually of fact, [and] knowledge of its falsity or other evidence of an intent to deceive by inducing reliance, and justifiable reliance by the plaintiff to his damage."  La Crosse Garment Mfg. Co. v. United States, 432 F.2d 1377, 1381-82 (Ct. Cl. 1970).  Plaintiff charges that the Corps misrepresented that (1) plaintiff could not recover lost profits through a termination for convenience, and (2) plaintiff would receive additional work to replace Contract 0004.  See Pl.'s Br. filed Nov. 13, 2009, at 53.  The extent of the Corps's "misrepresentations and false promises [was] not unearthed or discovered by IMS until discovery in this litigation."  Id. at 51.  The court finds that, even with the fruits of discovery, plaintiff has not made a showing of fraud necessary to obviate the December 23, 1996 release.

First, although the Corps could have issued a timely termination for convenience, 14/ the Corps did not misrepresent or deceive plaintiff concerning plaintiff's entitlement to lost profits.  Rather, the Corps accurately represented plaintiff's entitlement to lost profits under

––––––––––––––––––––

14/  BY MR. CAMARDO:

Q  Do you know why it would have taken so long to terminate IMS's contract?  In other words, from September 13, 1994 until March 25, 1996?

A  [Mr. Ryals]  My recollection is we were going through a lot of effort to try to see what we could do to keep . . . IMS operating there, make utilization of them at Watervliet and also get our project completed and avoid penalties.

Q  So there [were] some negotiations going on with IMS between September 13, 1994, and the date they were terminated?

A  Well, . . . yes, amongst many things, coordinating with the installation . . . .

Q  Well, was [there] negotiation going on with IMS?

A  I don't know.

Tr. at 847-48.

24

a termination for convenience.  Contract 0004 incorporated FAR 52.249-7, see PX 1, at 7, which provides that, "[i]f the termination is for the convenience of the Government, the Contracting Officer shall make an equitable adjustment in the contract price but shall allow no anticipated profit on unperformed services," FAR 52.249-7(b).  The March 25, 1996 notice from the Corps regarding the termination for convenience of Contract 0004 stated: "Profit will be considered on work performed.  Anticipatory profit and consequential damages will not be allowed . . . ."  PX 50, at 112.  On cross-examination Mr. Singh agreed that, when negotiating the settlement, Mr. Ryals told him that plaintiff could not receive lost profits on unperformed work, but did not represent that lost profits on performed work were unavailable.  See Tr. at 359; see also Tr. at 875 (Ryals) (IMS "[c]ould not get profit on work not performed, that's correct.").  15/

Plaintiff goes further.  According to plaintiff, because Corps personnel had created records admitting that a termination for convenience would be problematic, any termination would have been wrongful and plaintiff would have been entitled to lost profits.  Thus, the Corps's alleged fraud derives from plaintiff's belief that "the Corps had no basis to terminate the contract for convenience to begin with."  Pl.'s Br. filed Nov. 13, 2009, at 50. Certainly, documents unearthed in plaintiff's discovery, including correspondence authored by Ms. Robertson, appear to validate plaintiff's belief.  See PX 15 ("[T]hey do not have a strong position to [terminate for default] nor can they support a [termination for convenience][.]"); PX 27 (implying that the Corps might lose money with a termination for convenience).

Having reviewed the documentary evidence, the court finds that the discordant opinions of Ms. Robertson and other Corps personnel were minority views.  In addition to her critical comments, Ms. Robertson recorded that a termination for convenience might be

---

15/  Plaintiff draws negative inferences from the Corps's business records.  See PX 45 (indicating, in an unattributed record, that "[i]f [Mr. Singh] argues that he has [been] unjustly deprived of all the work, he has a case to collect the remaining $1,000,000 on the contract and possibly damages as well"); PX 48 (indicating, in an unattributed record, that "IMS, P.C. could claim the remainder on the contract ($1M) plus damages").  These comments are the speculation of unidentified Corps employees regarding the Corps's administration of Contract 0004 and the legal position that plaintiff could have taken in subsequent litigation.  To the extent that the author of PX 48 offered a legal opinion, the author was incorrect.  Having first concluded that a "Termination for Convenience of the Government is the only viable option," PX 48, the author speculated that plaintiff "could claim the remainder on the contract ($1M) plus damages[,]" id.  This is not the law.  See FAR 52.249-7.  Moreover, plaintiff did not prove that any Corps employee communicated to him this misinformation.

proper.  See PX 19 ("[W]e need to discuss what/how we are going to [terminate for convenience] this contract. . . . [A]n organization cannot [terminate for convenience] a contract without written authorization . . . [and] [w]e already have this[.]").  LTC Graves and COL Inouye believed that the Corps could execute a termination for convenience.  See PX 23 ("We intend to [t]erminate IMS, but haven't done so yet."); PX 24 ("Based on mission requirements the [Huntsville Division] contract was terminated[.]"); PX 25 (mentioning a termination for convenience as an option given to Mr. Singh).  Likewise, Mr. Ryals convinced the court that, as contracting officer, he considered that a termination for convenience could have issued in 1994.  See also PX 45 (Mr. Ryals's handwritten note indicating that a termination for convenience will issue based on "user request").  In other documents, unidentified authors recorded that a termination for convenience could occur. See  PX 48 ("Termination for Convenience of the Government is the only viable option.").  16/  COL Inouye's testimony contributed no significant recollection of events, but LTC Graves was persuasive that the Corps's approach to Mr. Singh considered several options, including a termination for convenience, which he regarded as "within our rights." Tr. at 769.

Assuming that the Corps's deciding officials considered that a termination for convenience was proper, their subjective opinions would not absolve the Corps of a pretextural transfer of plaintiff's work.  See H&S Mfg., Inc. v. United States, 66 Fed. Cl. 301, 310-11 (2005); see also PX 15 ("[T]he work at [Watervliet] is still necessary."); PX 45 ("We have arbitrarily awarded the same work to another [architect-engineer]."); PX 46 ("[MP] is awarded six Delivery Orders totaling $1.1 million by Baltimore District.  The scopes of work are essentially the same as the IMS contract scope of work.").  But see PX 6 ("Continuance with the present contract [with IMS] would constrain this effort [in implementing the Watervliet work plan], add extra costs, and prolong the investigation and clean up efforts."); PX 12 ("IMS is hard to negotiate [with], change orders are overpriced, [it] employs non-US citizens that must be escorted at [Watervliet], [and] [it does] not have the manpower to do this extra effort[.]").  Plaintiff's discovery may have revealed for the first time to plaintiff the dissatisfaction and disagreement within the Corps regarding the transfer of work under Contract 0004 and the proposed termination for convenience, but plaintiff was aware in 1994 that the work had been transferred to MP.

---

16/ Plaintiff's Memorandum of Contentions of Fact and Law twice misrepresents PX 48 to state that the Corps possessed "[i]nsufficient documentation to support termination[.]" See Pl.'s Br. filed Nov. 13, 2009, at 20, 35.  Rather, the unidentified author of PX 48 recorded that the Corps had "[i]nsufficient documentation to support termination for default." PX 48 (emphasis added).

The SBA and Corps personnel described the Corps's diversion of plaintiff's work as unprecedented.  Ms. Huber advised the chief of contracting that the action "went against everything that the small business program stands for and what my job is."  Tr. at 617 (Huber); see also Tr. at 621 (Huber) (testifying that LTC Graves knew she "was upset about the whole situation").  Ms. Huber expected that LTC Graves would find plaintiff substitute work.  Ms. Correale agreed that the Baltimore District was attempting to obtain additional work for plaintiff because of the transfer of work under Contract 0004 to MP.  Tr. at 751 (Correale).  Although the court finds that the deciding officials (LTC Graves and Contracting Officer Ryals) did not consider the options that they explored involving the termination of Contract 0004 to be impermissible or not lawful, they were aware that the treatment of plaintiff was, as LTC Graves expressed, "not common, but not unique."  Tr. at 769.

As previously discussed, however, although plaintiff might not have been aware of the dissension within the Corps and the contretemps with the SBA, plaintiff knew and appreciated that its work had been transferred to a large contractor prior to the parties' settlement and release negotiations.  At that time, rather than negotiating with the Corps, plaintiff could have challenged the termination for convenience as improper, sued for breach based on the Corps's bad faith, and sought anticipatory profits.  See Torncello v. United States, 681 F.2d 756, 772 (Ct. Cl. 1982) (en banc) (rejecting, in context of requirements contract, unfettered use of termination for convenience and stating that the "government may not use the standard termination for convenience clause to dishonor, with impunity, its contractual obligations"); Nat'l Factors, Inc. v. United States, 492 F.2d 1383, 1385 (Ct. Cl. 1974) ("The termination of a contract for the convenience of the government is valid only in the absence of bad faith or a clear abuse of discretion.").  But see Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302, 1304-05 (Fed. Cir. 1998) (declining to extend Torncello beyond requirements contracts to encompass indefinite-quantity contracts); Caldwell & Santmyer, Inc. v. Glickman, 55 F.3d 1578, 1582 (Fed. Cir. 1995) (limiting Torncello to the "'unremarkable proposition that when the government contracts with a party knowing full well that it will not honor the contract, it cannot avoid a breach claim by adverting to the convenience termination clause'" (quoting Salsbury Indus. v. United States, 905 F.2d 1518, 1521 (Fed. Cir. 1990)).  Plaintiff cannot, as is its present intention, impute to the Corps's settlement and release negotiations what plaintiff already knowingly and voluntarily released—a claim that the Corps showed bad faith in administering Contract 0004 and in proceeding to obtain a termination for convenience.

Plaintiff would impose not only a legal duty on the Corps to advise Mr. Singh that plaintiff could recover lost profits if it sued, but also an affirmative duty to disclose during the 1996 negotiations that some Corps personnel earlier had questioned both the Corps's position on a termination for convenience and the Corps's handling of Contract 0004.  The court found Mr. Ryals to be a forthright witness.  Mr. Ryals negotiated honestly and fairly,

and he accurately represented plaintiff's entitlement to profits under a termination for convenience. Mr. Singh declined Mr. Ryals' suggestion that plaintiff retain an attorney. During the parties' in-person negotiations, Mr. Singh did not ask Mr. Ryals whether a termination for convenience was justified or whether plaintiff could or should withdraw from the negotiations and sue for anticipatory profits, and Mr. Ryals was not obligated to advise Mr. Singh that the Corps did not have an airtight termination for convenience or that plaintiff could recover in breach the lost profits on the entire contract if plaintiff elected not to settle and to sue for wrongful termination.

The Corps did not misrepresent to Mr. Singh that plaintiff would receive replacement work. The parties had discussions and negotiations regarding new work to be awarded to plaintiff, but plaintiff failed to show an express promise that the Corps would give work to plaintiff that would compensate *pro tanto* for losses that plaintiff incurred on Contract 0004 or that any replacement work would be forthcoming. 17/ Indeed, plaintiff could not link a representation by the Corps about affording plaintiff additional work to the parties' in-person settlement and release negotiations. Documentary evidence and the more credible testimony adduced at trial confirm that the Corps consistently rejected Mr. Singh's proposals that the

---

17/ Prior to the parties' settlement negotiations, LTC Graves informed Mr. Singh in an undated letter that "[m]y staff is pursuing other avenues of work to assist your firm in recovering from this loss of work [the transfer of Contract 0004 to MP]." PX 31. Not only is this comment equivocal support for plaintiff's proposition that it was promised replacement work, but the letter concludes with the qualified assurance that the Corps "looks forward to successful negotiations with your firm in reaching fair and reasonable prices for both the Government and IMS." Id. LTC Graves testified that the Corps considered an out-of-scope modification and a new contract to be awarded to plaintiff, not out of contractual obligation, but because "Mr. Singh came in and said that he was willing to work, and that he wanted work and that he needed work for the financial health of his company, and so we were trying to find work that he could perform." Tr. at 1072. Mr. Ryals credibly explained that the Corps intended merely to "try[] to find other opportunities for [plaintiff] to participate in." Tr. at 858.

When the Corps found other opportunities for plaintiff, i.e., Contract 0046 and Contract 0057, plaintiff received the contractually obligated amount of work to which it was entitled. See IMS Eng'rs-Architects, P.C., 87 Fed. Cl. at 552-53. The Corps endeavored to provide work under Contract 0046 and Contract 0057 to plaintiff as a result of plaintiff's loss of Contract 0004, see PX 31, but plaintiff could not show that these contracts were intended to compensate plaintiff fully for lost work under Contract 0004 or to approximate the amount of money that plaintiff might have earned through Contract 0004.

28

Corps, to facilitate a settlement, should promise additional work to plaintiff or link plaintiff's two other existing contracts with the settlement and release. 18/  See Tr. at 1093 (Ryals) ("I always tried to make it pretty straightforward that these are two separate contracts, that we're trying to just settle the [termination for convenience] here."); Tr. at 1095 (Ryals) ("No guarantees, no promises [that plaintiff would receive additional work], but I did try to continue the efforts to try to find work to put into the other contract."); see also PX 54, at 192 (discussing same).  Awarding Contract 0046 and Contract 0057 to plaintiff may have been motivated by a sense that transferring the work of a small business to a large business was unseemly, if not improper, but the settlement of the termination for convenience was not a commitment to make plaintiff whole through those contracts for the work that it had lost.

### (4)  Continued consideration of the claim does not obviate the release

The Court of Claims held that "where the conduct of the parties in continuing to consider a claim after the execution of the release makes it plain that they never construed the release as constituting an abandonment of the claim, . . . the release will not be held to bar the prosecution of the claim." J.G. Watts, 161 Ct. Cl. at 807 (citing Winn-Senter Constr. Co., 110 Ct. Cl. at 65-66).  Plaintiff contends that a Corps memorandum dated May 30, 1997 "summarizes the history of Contract 0004" and discusses the Corps's post-release plans to obtain additional work for plaintiff.  See Pl.'s Br. filed Nov. 13, 2009, at 54.  According to plaintiff, this memorandum reveals the Corps's continued consideration of plaintiff's claim following the December 23, 1996 release, thereby warranting obviation of the release.

It is unclear whether the Corps intended the May 30, 1997 memorandum to summarize the history of Contract 0004 or to provide a more expansive chronology of the entirety of the

---

18/  Mr. Singh testified that Mr. Ryals promised additional work or a new contract. See Tr. at 195-96, 200.  In this he-said/he-said dispute, Mr. Ryals proved to be the more credible witness.  Earlier Mr. Singh unconvincingly testified that LTC Graves's assurance that IMS would be treated "fairly and equitably," Tr. at 413, was tantamount to LTC Graves's "gentleman's word" that IMS would receive additional work, Tr. at 414, which would equate to compensating plaintiff for its losses on Contract 0004.  To the extent that the Corps committed to treat plaintiff fairly and equitably during the parties' subsequent interactions, it fulfilled its obligation under the terms of Contract 0046 and Contract 0057.  Although it appears that the Corps may have streamlined the award of these contracts to plaintiff and was aware that plaintiff hoped for compensation for the loss of work occasioned by the transfer of work under Contract 0004 to MP, these indefinite-quantity contracts guaranteed only minimum orders to plaintiff.  See IMS Eng'rs-Architects, P.C., 87 Fed. Cl. at 552-53.

Corps's recent interaction with plaintiff.  See PX 59, at 204 (entitled, indistinguishably, "IMS, P.C.[;] IQBAL SINGH, P.E. - PRESIDENT[;] CHRONOLOGY OF SIGNIFICANT PAST EVENTS").  On the one hand, the memorandum documents a March 31, 1997 order made under Contract 0057, and it also accounts for the total dollar amount paid by the Corps to plaintiff, including the $499,999.00 settlement and the amounts paid to plaintiff under Contract 0046 and Contract 0057, respectively.  See id., at 207, 209.  A memorandum for record captioned "DACA87-92-C-0004 (Watervliet Arsenal Contract) Contractor IMS Engineers" recites, as follows: "Termination was not to take place until negotiations were completed with IMS.  Contract presently was in negotiations with IMS for [an] IDTC Contract.  Contract was signed 30 June 95 [Contract 0057]."  PX 69, at 268.

On the other hand, the May 30, 1997 memorandum discusses the Corps's advice to plaintiff that plaintiff would compete openly with other firms for work.  See PX 59, at 208.  Nor does the memorandum link the award of future work to plaintiff—either through Contract 0046, Contract 0057, or otherwise—to the parties' settlement.  The cumulative listing of the amounts paid to plaintiff does not indicate that the Corps intended Contract 0046 and Contract 0057 to be vehicles for supplementing the compensation awarded to plaintiff pursuant to the parties' settlement.  Although Mr. Ryals confirmed that he continued to search for new work for plaintiff, see Tr. at 892-93, he also convincingly testified that any additional work—to include Contract 0046 and Contract 0057—remained unconnected to the parties' settlement and plaintiff's release, see Tr. at 1093, 1095; see also PX 54, at 191-92.  The record does not support a finding of either an intent to continue considering plaintiff's claims or a ground not to respect the December 23, 1996 release.

II.  Judgment at trial pursuant to RCFC 52(c) on plaintiff's financing charges

At the close of plaintiff's case-in-chief, the court granted in part defendant's motion for judgment on partial findings pursuant to RCFC 52(c), having found that plaintiff's claim for financing charges as an element of its damages failed as a matter of proof.  See Tr. at 1069.  Plaintiff allegedly incurred financing charges from approximately February 24, 1994—when the Corps knew it would terminate Contract 0004—until the parties' "actual" settlement on December 23, 1996.  PX 72.  Plaintiff contended that "[d]uring this period of time IMS had to carry/finance [Contract 0004] because of the government's actions and inactions."  Id.  Plaintiff financed its work by relying on credit cards and by borrowing from Mr. Singh's friends and family, see Tr. at 282 (Singh), and the court admitted into evidence plaintiff's selected credit card statements and invoices, see PX 76.  Plaintiff calculated

$106,812.71 of financing costs by assuming a "conservative" interest rate of 10%, 19/ multiplied by the amount for which Contract 0004 settled, i.e., $377,411.09, and the duration of plaintiff's financing its performance.  See PX 72.

1.  Standard of review, RCFC 52(c)

Rule 52(c) provides, as follows:

> If a party has been fully heard on an issue during trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.  The court may, however, decline to render any judgment until the close of the evidence.  A judgment on partial findings must be supported by findings of fact and conclusions of law as required by RCFC 52(a).

"In the Court of Federal Claims, the judge serves as both the trier of fact and the trier of law."  Cooper v. United States, 37 Fed. Cl. 28, 35 (1996), aff'd per curiam, 121 F.3d 728 (Fed. Cir. 1997) (unpublished table decision).  A motion for judgment on partial findings requires more than determining if plaintiff has made a *prima facie* case.  Rather, RCFC 52(c) allows the judge to weigh the evidence presented, but, unlike a motion for summary judgment, does not require that the judge resolve all credibility determinations in favor of plaintiff.  See Howard Indus., Inc. v. United States, 115 F. Supp. 481, 484-85 (Ct. Cl. 1953); Cities Serv. Pipe Line Co. v. United States, 4 Cl. Ct. 207, 208 (1983), aff'd, 742 F.2d 626 (Fed. Cir. 1984)).

The Court of Claims in Howard Industries set forth the following guidelines:

> When a court sitting without a jury has heard all of the plaintiff's evidence, it is appropriate that the court shall then determine whether or not the plaintiff has convincingly shown a right to relief.  It is not reasonable to require a judge, on a motion to dismiss under Rule 41(b) [the precursor to RCFC 52(c)], to determine merely whether there is a *prima facie* case . . . sufficient for the consideration of a trier of the facts *when he is himself the trier of the facts*. . . . A plaintiff who has had full opportunity to put on his own case and has failed to convince the judge, as trier of the facts, of a right to relief, has no

_____

19/  "IMS incurred finance charges on its credit cards ranging from approximately 10% to over 20%.  In order to be conservative ISM [sic] has used a 10% rates [sic]."  PX 72.

legal right under the due process clause of the Constitution, to hear the defendant's case, or to compel the court to hear it, merely because the plaintiff's case is a *prima facie* one in the jury trial sense of the term.

115 F. Supp. at 485-86 (second alteration in original) (citations omitted). The time for plaintiff to prove its case is during its case-in-chief. Cooper, 37 Fed. Cl. at 35. "A plaintiff has no automatic right to cross-examine a defendant's witnesses for the purpose of proving what the plaintiff failed to establish during the presentation of its case." Id.

   2. Standard of review for proof of financing charges

   Plaintiff's claimed financing costs are expectancy damages. See Centex Corp. v. United States, 55 Fed Cl. 381, 390 (2003), aff'd, 395 F.3d 1283 (Fed. Cir. 2005), ("[F]oreseeable financing costs can be an element of expectancy damages."). Expectancy damages are intended to return "the benefits expected to be received had the breach not occurred." Fifth Third Bank v. United States, 518 F.3d 1368, 1374 (Fed. Cir. 2008) (citing Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1379 (Fed. Cir. 2001)). Expectancy damages include, but are not limited to, lost profits. Id. (citation omitted).

   A party is entitled to expectancy damages if it succeeds in making three showings. First, the damages must have been reasonably foreseeable at the time the parties created the contract. Id. (citing Cal. Fed. Bank v. United States, 395 F.3d 1263, 1267 (Fed. Cir. 2005)). Second, the damages would not have occurred "but for" the breach. Id. (citation omitted). Third, "the measure of damages must be reasonably certain, although if a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." Id. (citation omitted) (internal quotation marks omitted). Foreseeability, but-for causation, and proof of damages to a reasonable certainty are issues of fact to be determined by the trial court, respectively. Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1355-57 (Fed. Cir. 2001) (reviewing foreseeability, causation, and reasonable certainty under clear-error standard). The burdens of proving causation, foreseeability, and damages lie with the claimant. See, e.g., Willems Indus., Inc. v. United States, 295 F.2d 822, 831 (Ct. Cl. 1961).

   (1) Foreseeability

   As the United States Court of Appeals for the Federal Circuit has explained, "[e]xpectation damages are recoverable provided they are actually foreseen or reasonably foreseeable." Bluebonnet Sav. Bank, 266 F.3d at 1355; see also Cal. Fed. Bank, 395 F.3d at 1267. "'[In order to have been foreseeable] the injury that occurs must be one of such a kind and amount as a prudent man would have realized to be a probable result of his

breach.'"  Landmark Land Co. v. Fed. Deposit Ins. Corp., 256 F.3d 1365, 1378 (Fed. Cir. 2001) (alteration in original) (citation omitted).

### (2)  But-for cause

The breach must be the but-for cause of the damages.  See Cal. Fed. Bank, 395 F.3d at 1267.  The non-breaching party must establish, by a preponderance of the evidence, "the causal connection between the breach and the loss of profits."  Id. at 1267-68.

The breach may not constitute simply a "substantial factor" in causing the damages. Id. at 1268.  However, "[t]hat is not to say that the breach must be the sole factor or sole cause in the loss . . . . The existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach."  Id.

### (3)  Proof of damages to a reasonable certainty

The non-breaching party must prove its damages to a reasonable certainty.  See id. at 1267.  However, "'where responsibility for damages is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision . . . .'" San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) (alteration in original) (quoting Elec. & Missile Facilities, Inc. v. United States, 416 F.2d 1345, 1358 (Ct. Cl. 1969)).  When damages are not proved with precision, the court must determine "whether the evidence adduced at trial was sufficient to enable the fact finder . . . to make a 'fair and reasonable approximation.'"  Precision Pine, 2010 WL 569733, at *14 (quoting Nat'l Austl. Bank v. United States, 452 F.3d 1321, 1327 (Fed. Cir. 2006)); see also Bluebonnet Sav. Bank, 266 F.3d at 1356-57.

### 3.  Failure of plaintiff's claim for financing charges as a matter of proof

Defendant moved for judgment under RCFC 52(c) as to all of plaintiff's claims.  In granting the motion as to plaintiff's proof of its financing charges as an element of damages, the court did not rule on whether plaintiff could pursue a claim for financing charges as a matter of law.  In fact, the question remains open.  With tightly delineated exceptions, claims for interest cannot be maintained.  See England v. Contel Advanced Sys., Inc., 384 F.3d 1372, 1379 (Fed. Cir. 2004); J.D. Hedin Constr. Co. v. United States, 456 F.2d 1315, 1330 (Ct. Cl. 1972).  A contractor may, however, "recover interest actually paid on funds borrowed because of the government's delay in payments . . . ."  Wickham Contracting Co. v. Fischer, 12 F.3d 1574, 1582 (Fed. Cir. 1994) (citing Gevyn Constr. Co. v. United States, 827 F.2d 752, 754 (Fed. Cir. 1987)).  Thus, increased financing costs have been awarded, see Bluebonnet Sav. Bank, 266 F.3d at 1357, as "interest as an independent claim is recoverable

and is distinct from the interest *on* a claim, which is prohibited unless waived by statute or contract," Energy Nw. v. United States, No. 04-10C, 2010 WL 724019, at *29 (Fed. Cl. Feb. 26, 2010) (citing Centex Corp., 55 Fed Cl. at 390); see also Sys. Fuels, Inc. v. United States, slip op. at 12-18 (Fed. Cl. Mar. 11, 2010) (order on motion for reconsideration) (synthesizing underpinnings and relevant precedents regarding interest to be paid on damages vis-à-vis interest on claim).

    Plaintiff's documentary evidence of its financing charges—an incomplete collection of selected credit card receipts admitted into evidence as PX 76—is wholly insufficient as a matter of proof.  Mr. Singh testified that the receipts are merely representative of his personal credit-card use when financing plaintiff's expenses related to Contract 0004.  20/ See Tr. at 459-60 ("These are only samples of [a] variety of thing[s] giving a peek into the financial situation at that time with the firm while we are trying to meet the overhead expenses.").  Although the receipts suggest that charges on plaintiff's credit cards might have been subject to interest rates exceeding 10%, see generally PX 76, the court cannot infer from plaintiff's anecdotal records any basis to apply a uniform, ostensibly conservative interest rate of 10% to all of plaintiff's credit-card charges and to the financing (not memorialized by writings) that Mr. Singh said had been obtained from his family and friends, see PX 72.  21/  The receipts substantiate neither the money lent from Mr. Singh's family and

---

    20/  In response to defendant's motion for judgment on partial findings of fact, plaintiff's counsel argued:

>     I know we gave you a bunch of credit card receipts, and I know that we need to make some sort of showing and give you some sort of summary, but I don't think that was the intent.  I think that was the intent, just to show that, look, we've got some examples of how I was damaged here by the government tying up my funds, and I don't think there was any intent there to say, okay, here is all the damages through all these credit card receipts. . . . I think he was trying to bolster his 10 percent that he was asking for . . . .

Tr. at 1044-45.  The court takes plaintiff's counsel at his word: the credit card receipts are not a summary of plaintiff's financing costs.

    21/  Plaintiff's counsel asked the court to assign a suitable interest rate—either 10% or something less—"[b]ased on Mr. Singh's testimony and whatever the most reasonable rate back then was, a treasury resolution rate, whatever that would be."  Tr. at 1045.  Neither Mr. Singh's testimony nor any other evidence justifies a uniform interest rate of 10%.  Moreover, the court will not take judicial notice of a prevailing market rate to be applied uniformly to the different sources of plaintiff's insufficiently substantiated financing.

friends, nor the interest rates charged by these individuals.  See generally PX 76; see also Tr. at 1066-67.  Significantly, the receipts do not represent plaintiff's expenses pursuant to Contract 0004, as they include charges for work unrelated to Contract 0004. 22/

Mr. Singh's credit-card receipts do not establish any basis upon which the court could fashion damages either to a reasonable certainty or with any basis in reason at all for the period between the transfer of the work and the instruction not to proceed on the work plan. Mr. Singh's testimony that plaintiff was in a position where it had no other sources of revenue and had to stand in readiness in the event that the work plan might be approved may have a common-sense appeal, but that does not suffice as proof.  Mr. Singh's credit-card receipts, which are plaintiff's documentary support for its requested 10% interest rate, do not give the court a basis to find that the 10% rate was appropriate, or to apply it to any amount, or to infer the necessity to go out and obtain financing during this period due to the lack of incoming funds.  See Precision Pine, 2010 WL 569733, at *14 ("As the fact finder in the bench trial, the judge is responsible for deciding what evidence to credit or reject and what result to reach.").  In sum, plaintiff gives the court no fair and reasonable measure by which to approximate its financing charges.  See Bluebonnet Sav. Bank, 266 F.3d at 1356-57.  Mr. Singh's testimony and the related documentary evidence also fail to establish the causal link that is a necessary predicate to an award of expectancy damages.  See Cal. Fed. Bank, 395 F.3d at 1267; see also Wickham Contracting Co., 12 F.3d at 1583 (affirming administrative board finding that plaintiff "did not show that the amount sought based on the borrowed funds was incurred in connection with the [contested project]" when plaintiff responded to finding with only "conclusory statements" offered in the absence of evidence of a causal connection).

## CONCLUSION

Plaintiff has introduced documentary evidence that Corps personnel recognized that both the Corps's transfer to MP of Contract 0004's work and the Corps's subsequent termination of Contract 0004 were irregular and contravened the spirit of the 8(a) program. Nonetheless, these documents discuss events that occurred prior to plaintiff's December 23, 1996 release of all claims arising under Contract 0004.  While the evidence confirms Mr. Singh's allegations concerning the irregular administration and termination of Contract 0004, it also confirms that Mr. Singh knew enough about the Corps's actions when he executed the

---

22/  The credit-card statements document charges from Honolulu, Hawaii—expenses most likely attributable to plaintiff's performance on an unrelated contract.  See PX 76, at 279; see also PX 59, at 204 (indicating that Contract 0046 was awarded for work at Schofield Barracks, Hawaii).

release to obtain legal advice (as the Corps advised him) and to execute a knowing, valid release. <u>See, e.g.</u>, Tr. at 425 (Singh). Moreover, these irregularities do not change the facts that plaintiff's damages derive from continuing work at Watervliet without a Corps-approved work plan and that these damages have been presented to the Corps and to the court, respectively, without adequate documentation or, in lieu thereof, a reasonable explanation.

Plaintiff did not show that the December 23, 1996 release was coerced, tainted by wrongful conduct, obtained by fraud, or obviated by subsequent consideration. Plaintiff received a $499,999.00 settlement, which was fair and equitable, particularly given the paucity of plaintiff's documentation then and now. Plaintiff has not been able to substantiate entitlement to more, even with the benefit of discovery.

Based on the foregoing, and further to the order entered on June 26, 2009, granting partial summary judgment for defendant and further to the findings respecting plaintiff's claim for financing costs entered pursuant to RCFC 52(c), plaintiff has failed to prove by a preponderance of the evidence that it should overcome the release of claims dated December 23, 1996. Accordingly, the Clerk of the Court shall enter judgment for defendant.

**IT IS SO ORDERED.**

No costs.

/s/ Christine O.C. Miller

_____
**Christine Odell Cook Miller**
Judge